STATE OF NORTH CAROLINA v. HENRY LEE HUNT AND ELWELL BARNES

No. 5A86

(Filed 3 November 1988)

1. **Criminal Law § 15.1— murder—inflammatory pretrial publicity—change of venue denied**

The trial court did not err in a prosecution for first degree murder by denying defendant Hunt's motion for a change of venue or a special venire based on inflammatory media coverage where, although the trial court found that some of the newspaper articles were inflammatory, there was no evidence of the effect of the news reports on the residents of Robeson County. N.C.G.S. § 15A-957.

2. **Jury § 6— murder—individual voir dire denied—no prejudice from remarks of jurors**

The trial judge did not abuse his discretion in a prosecution for first degree murder by denying defendant Hunt's motion for individual voir dire and sequestration of prospective jurors where 146 potential jurors eventually had to be examined and the trial judge allowed selected individual voir dire whenever defendant requested it. Defendant was not prejudiced by certain remarks of prospective jurors. N.C.G.S. § 15A-1214(j).

3. **Criminal Law § 92.1— murder—multiple defendants—consolidation proper**

The trial court did not err by consolidating first degree murder cases for trial where one defendant, whom defendant Hunt claims he could not call as a witness because of the consolidation, was not called and it is not known whether he would have refused to testify; the witness could not have been compelled to testify if he had exercised his constitutional right not to incriminate himself; and the defense of defendant Barnes was not so antagonistic to the defenses of the other defendants that a severance was required. N.C.G.S. § 15A-926(b).

4. **Criminal Law § 92.1— conspiracy to murder—consolidation for trial—transactional connection**

There was a transactional connection supporting the consolidation for trial of two conspiracy and two murder charges where the second murder was committed to avoid detection for the first murder. N.C.G.S. § 15A-926(a).

**5. Criminal Law § 73.2— conspiracy to murder—statements not hearsay**

Testimony in a murder prosecution that the witness's wife had said that she was going to insure the victim and have him killed was not hearsay and was properly admitted. The testimony was not to prove that the victim's wife had insured the victim to have him killed, but was offered to show why the three defendants conspired to kill and then killed the victim. N.C.G.S. § 8C-1, Rule 801(c).

**6. Constitutional Law § 72; Criminal Law § 77.3— murder—statement of codefendant**

The trial court did not err in a murder prosecution by admitting into evidence an extrajudicial statement by a codefendant in which the codefendant recanted an earlier statement taking full blame and said that he had made that statement to protect someone. Defendant Hunt advanced no reason and the court could think of no reason the jury would infer that defendant Hunt was the person being protected. N.C.G.S. § 15A-927(c)(1).

**7. Criminal Law § 106— conspiracy and murder—evidence sufficient**

The evidence was sufficient for the jury to find defendant Hunt guilty of first degree murder and of conspiracy to commit the murder.

**8. Homicide § 21.5; Criminal Law § 9— murder and conspiracy to murder—evidence of constructive presence—sufficient**

The trial court did not err in a prosecution for conspiracy and murder by denying defendant Barnes' motion to dismiss as to the murder of Jackie Ransom where there was evidence that defendant Barnes asked Rogers Locklear whether he could take his brother's place in killing Jackie Ransom, defendant Barnes took Rogers Locklear to meet Henry Lee Hunt, defendant Barnes and Hunt were together when Rogers Locklear last saw them on the night of the murder, later that night the two men went to Hunt's trailer, the next morning defendant Barnes said he and Hunt had killed Ransom for $2,000, and defendant Barnes said Hunt had shot Ransom. The evidence was sufficient for the jury to conclude that defendant Barnes was present when the killing occurred with the intent to aid Hunt in the commission of the offense and that Hunt was aware of this intent.

**9. Homicide § 21.5; Criminal Law § 9— conspiracy and murder—evidence sufficient**

There was sufficient evidence for the jury to find that defendant Barnes aided and abetted in the murder of Larry Jones where there was evidence that defendant Barnes was in the automobile when Larry Jones was shot by Hunt, Barnes then started to shoot Larry Jones with a shotgun, Hunt told Barnes not to shoot Larry Jones and Hunt then shot Larry Jones again, and Barnes stood watch while Hunt and Ratley carried Jones' body into the woods and buried it.

**10. Conspiracy § 6— conspiracy to murder—evidence sufficient**

The trial court did not err by denying defendant Barnes' motions to dismiss two charges of conspiracy to murder where defendant Barnes asked Rogers Locklear if he could take his brother's place and kill Jackie Ransom;

State v. Hunt

defendant Barnes carried Rogers Locklear to Hunt's trailer and, after talking privately with Hunt, told Locklear "I got the gun. Me and Babe can get the job done"; there was evidence that Hunt told several people he would kill Larry Jones; Hunt and defendant Barnes were riding in an automobile with Jerome Ratley when they lured Larry Jones into the automobile, took him to a secluded place, and killed him; and defendant Barnes then said "that man was about to cause me to pull a life sentence."

**11. Criminal Law § 102.6— murder and conspiracy—prosecutor's argument—failure to intervene ex mero motu—no error**

The trial court did not err in a prosecution for murder and conspiracy by not intervening *ex mero motu* when the prosecutor argued that defendant Hunt was a professional assassin because the evidence supported a reasonable inference that defendant Hunt was a professional; when the prosecutor read questions from the Bible supporting the death penalty because the prosecutor was anticipating reliance by the defense on the commandment "Thou shalt not kill"; and references to previous sentences by the prosecutor did not suggest the possibility of parole in so direct a manner as to amount to a gross impropriety.

**12. Homicide § 25— murder and conspiracy—instructions—no error**

There was no plain error in a prosecution for murder and conspiracy where defendant Hunt argued that the court's instructions were so complex and so confusing that they were incomprehensible to the jury. N.C. Rules of Appellate Procedure, Rule 10(b)(2).

**13. Criminal Law § 135.8— murder—aggravating factor—prior conviction involving violence to person**

There was no prejudice in a prosecution for murder by allowing the admission of evidence in the sentencing phase to support the aggravating factor of conviction of a felony involving the use of or threat of violence to the person that defendant Hunt had previously been convicted of conspiracy to dynamite a dwelling house and of dynamiting a dwelling house where the State was not able to offer any evidence that the house was occupied at the time of the dynamiting, the court allowed defendant's motion to strike, the court instructed the jury not to consider the evidence, and the State introduced evidence that defendant had been convicted of three separate charges of armed robbery. N.C.G.S. § 15A-2000(e)(3) (1988).

**14. Criminal Law § 135.8— murder—aggravating factor—murder committed to avoid arrest**

The trial court did not err in a prosecution for murder by submitting to the jury the aggravating factor that the crime was committed to avoid or prevent a lawful arrest or to effect an escape from custody where the evidence, viewed in the light most favorable to the State, raises more than an inference that defendant Barnes abetted and aided defendant Hunt in killing the second victim to avoid being arrested for the murder of the first victim. N.C.G.S. § 15A-2000(e)(4) is not overbroad as interpreted and applied in this case, and the merger rule was not violated by the submission of this aggravating factor.

**15. Criminal Law § 135.8— murder—aggravating factor—avoidance of another's arrest**

The trial court did not err in the sentencing phase of a prosecution for murder by instructing the jury that in order to find the aggravating factor specified in N.C.G.S. § 15A-2000(e)(4) the jury must find that "when Elwell Barnes aided or abetted Henry Lee Hunt in the killing of Larry Jones, he did so with the purpose to avoid and prevent his arrest or the arrest of Henry Lee Hunt for the killing of Larry Jones—for the killing of Jackie Ransom." When the judge said "for the killing of Larry Jones" he made a verbal error which he quickly corrected and it was not error to instruct the jury to find the factor whether they found that Barnes acted to prevent his own arrest or to prevent an accomplice's arrest. The statute refers to preventing a lawful arrest; it need not be the defendant's own arrest.

**16. Criminal Law § 135.8— murder—aggravating factor—pecuniary gain**

The trial court did not err when sentencing defendant Barnes for murder by submitting the aggravating factor that the murder was committed for pecuniary gain where there was evidence that, when Rogers Locklear went to A. R. Barnes' house, defendant Barnes asked Locklear if he would let him take A. R.'s place and if he would pay him the same amount he had offered to A. R. and, when asked on the morning after the murder why he and Hunt had killed Ransom, defendant Barnes replied "for $2,000."

**17. Criminal Law § 135.4— contract killing—aiding and abetting—Enmund v. Florida distinguished**

*Enmund v. Florida,* 458 U.S. 782, did not apply where the evidence showed that defendant Barnes was an aider and abettor in two murders which were committed with premeditation and deliberation and that defendant Barnes intended that the victims be killed.

**18. Criminal Law § 135.7— capital sentencing—consideration of mitigating factors —instructions**

The death penalty is not unconstitutional as applied in North Carolina because the jury is instructed that one issue is "Do you find beyond a reasonable doubt that the mitigating circumstance or circumstances you have found are insufficient to outweigh the aggravating circumstance you have found?" If the jury must be satisfied beyond a reasonable doubt before finding that the mitigating circumstances outweigh the aggravating circumstances and the jury is in a state of equipoise as to the issue, it would answer the issue "no." Furthermore, the argument that it was error for the court to charge the jury that they must be unanimous before they could find a mitigating circumstance was overruled.

**19. Criminal Law § 135.7; Constitutional Law § 80; Jury § 7.11— death penalty—prior rulings upheld**

The Supreme Court in a murder prosecution overruled assignments of error challenging the North Carolina death penalty as unconstitutional, the death qualification of the jury, instructions on the duty to recommend death, and the placement of the burden of proof for mitigating circumstances on defendants where those issues had previously been decided against defendants' positions.

State v. Hunt

**20. Constitutional Law § 30— murder—no bill of particulars for aggravating factors—no disclosure of impeaching or exculpatory information—no error**

The Supreme Court in a murder prosecution declined to overrule prior decisions on issues involving the denial of a bill of particulars regarding aggravating factors and the denial of a motion for disclosure of impeaching or exculpatory information.

**21. Jury § 6; Constitutional Law § 45— murder—denial of motion for sequestration and individual voir dire—denial of motion to appear as co-counsel—no error**

The Supreme Court in a murder prosecution declined to overrule previous opinions regarding the issues of denial of a motion for sequestration and individual voir dire and denial of a motion to appear as a co-counsel.

**22. Criminal Law § 135.10— murder—death sentences—not disproportionate**

Death sentences for two defendants who committed a contract killing and then eliminated a witness were not imposed under the influence of passion, prejudice and other arbitrary factors and were not disproportionate. N.C.G.S. § 15A-2000(d)(2).

Chief Justice EXUM concurring.

Justice FRYE dissenting as to sentence.

APPEAL by defendants pursuant to N.C.G.S. § 7A-27(a) from judgments imposing sentences of death entered by *Clark, J.,* at the 18 November 1985 Session of Superior Court, ROBESON County. The defendants' motions to bypass the Court of Appeals as to lesser sentences were allowed pursuant to N.C.G.S. § 7A-31(b). Heard in the Supreme Court 11 May 1988; additional arguments heard 22 August 1988.

Henry Lee Hunt, Elwell Barnes and A. R. Barnes were tried for the murder and conspiracy to commit murder of Jackie Ransom. In the same trial Hunt and Elwell Barnes were tried for the murder and conspiracy to commit the murder of Larry Jones. Evidence at the trial tended to show that Dottie Locklear Ransom had first married Rogers Locklear. Locklear was a construction worker and often worked out of town for several days at a time. Dottie began seeing Jackie Ransom while Locklear was out of town. She eventually married him, although she never divorced Locklear. Ransom began living with her while Locklear was out of town, and would leave the house when it was time for Locklear to return.

In July 1984, Dottie asked Locklear about the possibility of insuring Ransom's life and then having him killed. She wanted to

buy a trailer and a cafe. On 3 August 1984 she purchased a $25,000 life insurance policy. She asked the agent whether, if Ransom were killed in a fight, she would be entitled to double indemnity for accidental death.

Dottie asked Locklear to find a hit man to kill Ransom. Locklear asked his brother Harry to run over Ransom with his car. Harry refused, but told Locklear that if he wanted a hit man he should see A. R. Barnes.

On 16 August, Locklear met A. R. Barnes and gave him a ride to Locklear's house. After some negotiation Rogers and Dottie Locklear agreed to pay A. R. Barnes $2,000 to kill Jackie Ransom. A. R. Barnes said "If I don't kill him, I'll get it done."

Locklear and A. R. met several times after that. On 8 September, Locklear went to A. R.'s house to see if he was going to kill Ransom, and to tell him the insurance policy had been received. Locklear did not see A. R., but saw his brother, the defendant Elwell "Babe" Barnes. Elwell Barnes asked Locklear if he could take his brother's place, and kill Ransom for the same compensation Locklear had promised his brother. Locklear replied that it was up to him.

Elwell Barnes then told Locklear to drive him to the home of the defendant Henry Lee "Mulehead" "Buck" Hunt. When they arrived at Hunt's trailer, Barnes talked with Hunt privately for about 10 minutes. Later, Hunt got into the car, put his hand on his pocket and told Locklear "I got the gun. Me and Babe can get the job done." Barnes replied "Yeah." They drove past a house and Hunt looked at it and said "That looks like where Jackie stay, there." They then drove down a road into some woods and Hunt put the gun in some bushes. They then drove back into town, and Locklear pointed out Jackie Ransom. Hunt told Locklear to get his wife and take her to a place at which there would be witnesses.

At about 11:00 or 11:30 that night the defendants Hunt and Elwell Barnes returned to Hunt's trailer. Hunt took off his clothes and put them in the washing machine, and put a pistol under his mattress. Barnes spent the night on the couch. The next morning Bernice Cummings, who lived with Hunt at his trailer, asked Barnes where they had been the night before. Barnes replied that

they had killed Jackie Ransom for $2,000, for Dottie and Rogers Locklear. Bernice asked who shot Ransom and Barnes replied "Henry Lee Hunt."

Later that day Locklear drove to Hunt's trailer. Hunt walked up to him and said "I killed Jackie last night." He said he wanted his money in 30 days or he would kill Dottie and Locklear. Later that day, Ransom's body was found in a shallow grave. An autopsy revealed that Ransom died from a gunshot wound to the head.

The next day, 10 September, the defendants were at Hunt's trailer. Buddy Roe Barton drove up. Hunt went to Barton's car and returned after a few minutes, and stated that Larry Jones was running his mouth, and that he "would put a stop to his damn mouth."

Larry Jones lived with Hunt's sister Aganora. He met several times with Detective Mike Stogner of the Lumberton Police Department and SBI Agent Lee Sampson and talked about Ransom's death.

On 14 September, Hunt told Bernice Cummings that he was going to "kill that water-headed, ratting son-of-a-bitch Larry Jones" and wanted to get a shovel so he would "bury him where he never could be found." He stated that Jones had been running his mouth and that he knew that Hunt had killed Ransom. Hunt procured a shovel from Mitt Jones and put it in his trunk. Later, Hunt got a shotgun and put it in the trunk of Bernice's car. Hunt said to Aganora and Bernice that he was going to kill Larry Jones because Jones knew he killed Jackie Ransom, and could get him a life sentence.

Later that day Hunt and Elwell Barnes were riding in an automobile driven by Jerome Ratley when they picked up Jones. They went to the home of a person called "String Bean." They left that place and continued driving. Hunt told Ratley to turn off onto a dirt road, then onto a tram road. Then Hunt told Ratley to stop and turn off the lights. Hunt then turned around and shot Jones in the chest. Ratley saw two or three shots. Hunt said "You don't eat no more cheese for no damn body else. I'll meet you in heaven or hell, one." Hunt then pulled Jones out of the car, and Barnes got the shotgun from the trunk. Jones started mumbling "Mule, Mule." Barnes pointed the shotgun at Jones' head. Hunt

said "Don't shoot him with the shotgun," and shot him with the pistol several times. Barnes kept a lookout while Hunt and Ratley dragged Jones' body into the woods about a hundred yards and buried him in a shallow grave. As they rode back into town, Barnes said "That man was about to cause me to pull a life sentence."

The next morning, 16 September, Hunt told Bernice Cummings that he had carried Larry Jones to where he would never be found.

On 1 October, Jones' body was found. An autopsy revealed that he died of a gunshot wound to the head. A ballistics expert testified that bullets removed from the body were fired from the .25 caliber Beretta that Hunt had given his son-in-law after the murders. While in jail, Hunt told his son-in-law he had killed Ransom and Jones. He also told him to get rid of the gun, and to get his brother to "get rid of the black guy," meaning Jerome Ratley, because "He's the one that can hurt me most."

At the close of all the evidence, the trial court granted a mistrial as to A. R. Barnes. The jury returned verdicts of guilty on all counts as to Elwell Barnes and Hunt, and recommended that both be sentenced to death for each murder charge. The court sentenced them to death for each murder charge and ten years imprisonment for each conspiracy charge.

*Lacy H. Thornburg, Attorney General, by G. Patrick Murphy, Assistant Attorney General (in Hunt case), and Ralf F. Haskell, Special Deputy Attorney General (in Barnes case), for the State (original brief and argument); Lacy H. Thornburg, Attorney General, James J. Coman, Senior Deputy Attorney General, William N. Farrell, Jr., Special Deputy Attorney General, Joan H. Byers, Special Deputy Attorney General, and Barry S. McNeill, Assistant Attorney General, for the State (supplemental brief and argument).*

*H. Mitchell Baker, III and Angus B. Thompson, II, for defendant appellant Hunt; Bruce W. Huggins, for defendant appellant Barnes (original brief and argument); Malcolm Ray Hunter, Jr., Appellate Defender, and Louis D. Bilionis, for defendant appellants (supplemental brief and argument).*

*E. Ann Christian and Robert E. Zaytoun for North Carolina Academy of Trial Lawyers, amicus curiae.*

*John A. Dusenbury, Jr., for North Carolina Association of Black Lawyers, amicus curiae.*

WEBB, Justice.

[1]  In his first assignment of error, defendant Hunt contends the trial court erred in denying his motion for a change of venue or a special venire. He argues that extensive inflammatory media coverage of the murders, coupled with extensive word-of-mouth publicity, made it impossible for him to receive a fair trial by a Robeson County jury.

N.C.G.S. § 15A-957 provides, in pertinent part:

> If, upon motion of the defendant, the court determines that there exists in the county in which the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial, the court must either:
>
> (1) Transfer the proceeding to another county in the prosecutorial district as defined in G.S. 7A-60 or to another county in an adjoining prosecutorial district as defined in G.S. 7A-60, or
>
> (2) Order a special venire under the terms of G.S. 15A-958.

The purpose of N.C.G.S. § 15A-957 is to insure that jurors decide cases based on evidence introduced at trial and not on something they have heard outside the courtroom. *State v. Abbott*, 320 N.C. 475, 358 S.E. 2d 365 (1987). Under this statute, the burden is on the moving party to show that "it is reasonably likely that prospective jurors would base their decision in the case upon pretrial information rather than the evidence presented at trial and would be unable to remove from their minds any preconceived impressions they might have formed." *State v. Gardner*, 311 N.C. 489, 497, 319 S.E. 2d 591, 597-98 (1984). In most cases a showing of identifiable prejudice to the defendant must be made, and relevant to this inquiry is testimony by potential jurors that they can decide the case based on the evidence presented and not on pretrial publicity.

At a pretrial hearing before Samuel E. Britt, Judge, the defendant offered evidence that Robeson County had a population of approximately 105,000. The *Robesonian,* a county newspaper, had a circulation in Robeson County of between 15,000 and 16,000 on weekdays and between 16,000 and 17,000 on Sundays. The *Fayetteville Observer* had circulations in Robeson County of approximately 3,100 and 1,600, respectively. Between the date of the first murder, 8 September 1984, and the date of the hearing, 12 September 1985, 16 articles concerning the murders appeared in the *Robesonian,* 8 appeared in the *Fayetteville Times,* 3 appeared in the *Fayetteville Observer,* and 6 newscasts concerning the murders were broadcast on the radio. Judge Britt found that some of the articles in the *Robesonian* were inflammatory. The first article mentioning defendant Hunt was entitled " 'Professional Killer' charged in Two Murders" and included these statements:

> "From what I know about him, he's the most dangerous person in Robeson County" [Sheriff's Department Detective] Locklear said. "He has a reputation for murder."
>
> . . . .
>
> "He's a professional killer," [Police Captain] Taylor said of Hunt. ". . . He seeks out people, stalks them, and then lures them away from a place, and then kills them."
>
> . . . .
>
> Robeson County Sheriff Hubert Stone said, "We consider him (Hunt) to be one of the most hardened criminals in Robeson County. We're investigating him into some other murders in the Lumberton area as well."
>
> Stone would not say which murders Hunt may be connected with but said the number may be six or seven.
>
> Hunt has previously been arrested for assault and battery, larceny of hogs, manufacturing non-tax paid liquor, conspiracy in use of explosives, and armed robbery.

Several other articles contained similar information.

The court found that some of the newspaper articles were inflammatory but found the defendant had not made a showing that the prospective jurors would base their decisions upon pre-

trial information rather than evidence presented at trial. The motion for change of venue or a special venire was denied.

In the court's ruling we find no error. This case is distinguishable from *State v. Jerrett*, 309 N.C. 239, 307 S.E. 2d 339 (1983), in which there was plenary testimony that the majority of residents of Alleghany County had formed opinions which would make it difficult for them to decide the case based on the evidence produced in court. In this case there was no evidence of the effect of the news reports on the residents of Robeson County other than the reports. Of the twelve jurors who decided the case, five had no prior knowledge of the case, five had read something about it and two had heard it discussed. All jurors stated unequivocally that they could make their decisions unaffected by anything they had heard or read. We hold that we cannot disturb the ruling of the superior court that the defendant Hunt did not show it was "reasonably likely that prospective jurors would base their decision in the case upon pretrial information rather than the evidence presented at trial and would be unable to remove from their minds any preconceived impressions they may have formed."

[2] Defendant Hunt further contends that the trial court erred in denying his motion for individual voir dire and sequestration of the prospective jurors. He argues that he was prejudiced when several potential jurors made certain remarks in the presence of other potential jurors.

N.C.G.S. § 15A-1214(j) provides: "In capital cases the trial judge for good cause shown may direct that jurors be selected one at a time, in which case each juror must first be passed by the State. These jurors may be sequestered before and after selection." Motions for individual voir dire and jury sequestration are addressed to the discretion of the trial judge; his ruling will not be reversed absent a showing of abuse of discretion. *State v. Reese*, 319 N.C. 110, 353 S.E. 2d 352 (1987).

We hold that the defendant has shown no abuse of discretion in the present case, especially in light of the fact that 146 potential jurors eventually had to be examined, and in light of the fact that the trial judge did allow selective individual voir dire whenever defendant requested it. Furthermore, we are not convinced that the defendant was prejudiced by the remarks by the

prospective jurors of which he complains. Prospective juror Otis Lloyd stated that he was in the insurance business, had talked to defendant about insurance and had been to the defendant's home. This remark was not prejudicial. Prospective juror Willie Taylor stated that he was a correctional officer and knew the defendant when defendant was in prison. Prospective juror Ray Hunt stated that he had made a bond for the defendant. These remarks did not prejudice defendant because there was evidence at the trial that defendant had been in prison. Potential juror Mary Oxendine stated that she had been told that codefendant A. R. Barnes was with her brother when he was murdered. This remark could not have prejudiced defendant Hunt since his name was not even mentioned. Potential juror Merril Locklear stated that when he was in elementary school, he and the defendant "would always pick at one another. You know, arguments or fights or something like that." This is such commonplace behavior among children that it cannot have been prejudicial. Several other prospective jurors stated that they had already formed opinions as to the defendant's guilt or innocence. We cannot assume that this prejudiced the defendant. Moreover, each of the jurors who actually decided the case stated that they had no preconceived opinions and could give the defendant a fair trial based on the evidence. The defendant has shown no abuse of discretion. This assignment of error is overruled.

[3]   Both defendants assign error to the consolidation of their cases for trial with the cases of the other defendants pursuant to N.C.G.S. § 15A-926(b) and to the denial of their motions for severance of the cases for trial. Hunt, relying on *State v. Boykin,* 307 N.C. 87, 296 S.E. 2d 258 (1982) and *State v. Alford,* 289 N.C. 372, 222 S.E. 2d 222, *vacated in part, Carter v. North Carolina,* 429 U.S. 809, 50 L.Ed. 2d 69 (1976), says his defense was antagonistic to the defenses of A. R. Barnes and Elwell Barnes and that by consolidating the cases for trial he was deprived of evidence he could have used in his defense. In *Alford* we held it was error to consolidate for trial first degree murder charges against Alford and a codefendant when the effect of the consolidation was to prevent Alford from introducing a confession by the other defendant in which Alford was exonerated. In *Boykin* each defendant was charged with the murder of a person. These cases were consolidated for trial and the State introduced several statements by

one of the defendants to the effect that he had shot the decedent. The court would not allow him to explain that he had made these admissions to protect the other defendant. The court also refused to let him cross-examine a deputy sheriff as to a confession the codefendant had made. Under these circumstances we held it was error to consolidate the two cases for trial because it prevented the defendant from eliciting testimony favorable to him.

Hunt argues that he was prejudiced by the consolidation of the cases for trial because it prevented him from the full benefit of out of court statements by A. R. Barnes. A. R. Barnes made two statements to officers on 27 September 1984 in which he told them he shot Jackie Ransom in self-defense during a time Hunt was not present. On 28 September 1984 A. R. Barnes recanted these statements. Hunt contends he was prejudiced by the con-solidation of the trials because he could not call A. R. Barnes as a witness and cross-examine him about these statements. We hold Hunt has not shown prejudice. He did not attempt to call A. R. Barnes as a witness and we do not know whether A. R. Barnes would have refused to testify. If the cases had not been con-solidated A. R. Barnes could not have been compelled to testify if he had exercised his constitutional right not to incriminate him-self. Hunt was not prejudiced by the consolidation of the cases for trial.

Elwell Barnes contends it was error to consolidate his trial with the trial of A. R. Barnes because his defense was antagonis-tic to the defense of A. R. Barnes. He says the theory of his defense as to the murder of Jackie Ransom was that A. R. Barnes killed Jackie Ransom without any assistance from Elwell Barnes. As to the murder of Larry Jones, Elwell Barnes says the killing was done by Henry Lee Hunt and Elwell Barnes was a "passive participant." Elwell Barnes argues that if he had been able to cross-examine A. R. Barnes he could have shown A. R. Barnes' confession was true and his recantation of the confession was false and "subsequently destroyed the State's theory Elwell Barnes aided and abetted Henry Lee Hunt in the murder of Larry Jones." One difficulty with this argument is that had A. R. Barnes pled the Fifth Amendment, Elwell Barnes could not have called him as a witness if the trials of the two men had been severed.

In *State v. Belton*, 318 N.C. 141, 347 S.E. 2d 755 (1986) and *State v. Nelson*, 298 N.C. 573, 260 S.E. 2d 629 (1979), *cert. denied*

by *Jolly v. North Carolina*, 446 U.S. 929, 64 L.Ed. 2d 282 (1980), we dealt with the question of the severance of trials in which the defendants have antagonistic defenses. We held that defenses which are inconsistent are not necessarily so antagonistic as to require separate trials.

> The test is whether the conflict in defendants' respective positions at trial is of such a nature that, considering all the other evidence in the case, defendants were denied a fair trial.
>
> Prejudice would ordinarily result where codefendants' defenses are so irreconcilable that "the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." . . . Severance should ordinarily be granted where defenses are so discrepant as to pose an evidentiary contest more between defendants themselves than between the state and defendants. . . . To be avoided is the spectacle where the state simply stands by and witnesses "a combat in which the defendants [attempt] to destroy each other."

*Id.* at 587, 260 S.E. 2d at 640.

In this case there was plenary evidence of Elwell Barnes' guilt other than the statements of A. R. Barnes. The statements of A. R. Barnes tended to exonerate Elwell Barnes. This is not a case in which the State simply stood by and allowed the defendants to convict each other. The defense of Elwell Barnes was not so antagonistic to the defenses of the other defendants that a severance was required.

[4] Each defendant also contends it was error to consolidate for trial the two conspiracy and two murder charges against him. N.C.G.S. § 15A-926(a) provides in part:

> Two or more offenses may be joined in one pleading or for trial when the offenses, whether felonies or misdemeanors or both, are based on the same act or transaction or on a series of acts or transactions connected together or constituting parts of a single scheme or plan.

We have been liberal in our interpretation of this section. In *State v. Bracey*, 303 N.C. 112, 277 S.E. 2d 390 (1981), we held there was a transactional connection, which supported consolida-

tion for trial, between three separate common law robberies with similar modus operandi. In *State v. Williams*, 308 N.C. 339, 302 S.E. 2d 441 (1983), we held there was a transactional connection between two separate charges of rape committed against one woman twenty-six days apart. It is apparent that the second murder in this case was an act connected to the first murder. The second murder was committed to avoid detection for the first murder. This transactional connection supports the consolidation of all the charges for trial pursuant to N.C.G.S. § 15A-926(a).

[5] The defendant Hunt under one assignment of error contends that certain testimony should have been excluded. On direct examination Rogers Locklear testified as follows:

Q: . . . Along about June or July 1984, did you have occasion to have a conversation with your wife, Dottie Ransom?

. . . .

MR. THOMPSON: Object.

. . . .

THE COURT: Overruled, Gentlemen.

Q: Did you, sir?

A: Yes, sir.

Q: All right. Now, tell us about that conversation with Dottie Ransom, please.

A: Well, she told me that she was going to take insurance out on Jackie.

Q: All right. Go ahead.

A: And I asked her why was she going to take insurance out on him and she says, "So I can have him killed."

The defendant argues that this testimony was hearsay and his right to confront a witness against him guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution was violated by its admission. We hold this testimony was not hearsay and was properly admitted. N.C.G.S. § 8C-1, Rule 801(c) defines hearsay as follows: " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing,

offered in evidence to prove the truth of the matter asserted." The testimony of Rogers Locklear was for the purpose of showing why the three defendants including Hunt conspired to kill and killed Jackie Ransom. The above quoted colloquy was not to prove that Dottie Ransom insured Jackie Ransom's life so that she could have him killed but was to prove why Rogers Locklear contacted A. R. Barnes and later Elwell Barnes and Hunt to have Jackie Ransom killed. The jury did not have to judge the credibility of Dottie Ransom as to whether she intended to have Jackie Ransom killed. It had to judge the credibility of Rogers Locklear to determine why he conspired with the three defendants to kill Jackie Ransom. This testimony was not hearsay and was properly admitted. *See* 1 Brandis on North Carolina Evidence § 138 (1988).

[6]   Mike Stogner, a detective with the Robeson County Sheriff's Department, testified for the State. On cross-examination by the counsel for A. R. Barnes the following colloquy occurred.

Q: Was the statement given to you by A. R. Barnes on the 28th different from that given to you on the 27th?

A: Yes, sir, it was.

Q: How was it different?

A: It was a complete recantation of the original statement where he denied the first statement.

Q: All right. Did he tell you why he had given the statement that he did on September 27, 1984?

MR. BAKER: Object.

THE COURT: OVERRULED.

THE WITNESS: Yes, sir, he did.

Q: (By Mr. Bullard:) Would you tell us about that, please?

A: "A. R. Barnes stated that what he told Lee Sampson, SBI, and Detective Mike Stogner on Thursday and Thursday night, 9-27-84, about killing Jackie Ransom was not true. He was scared and was trying to cover up for someone else."

A. R. Barnes had made two statements to Mr. Stogner on 27 September 1984 in which he took full responsibility for the killing of Jackie Ransom. On 28 September 1984 he recanted this state-

ment. Hunt introduced into evidence the statements of 27 September 1984 and A. R. Barnes proffered the statement of 28 September 1984. The actual statement of A. R. Barnes to Mr. Stogner was that he was trying to protect Elwell Barnes. The statement was sanitized before its admission so as not to refer to Elwell Barnes as the person being protected.

The defendant Hunt contends that this extrajudicial statement of A. R. Barnes implicated him and his constitutional rights as delineated in *Bruton v. United States*, 391 U.S. 123, 20 L.Ed. 2d 476 (1968), were violated. *Bruton* holds that a defendant's Sixth Amendment right to confront witnesses against him is violated if he is implicated by the confession of a codefendant being tried with him who does not testify. N.C.G.S. § 15A-927(c)(1) provides that a prosecutor may introduce an out-of-court statement which would not otherwise be admissible if all references in the statement to the defendant are deleted so that the statement does not prejudice him. We hold that this statement did not implicate Hunt and was properly admitted into evidence. It did not mention Hunt. It did say that A. R. Barnes was attempting to protect someone else but Hunt has not advanced any reason and we can think of none as to why the jury would infer it was Hunt rather than someone else who was being protected.

The defendant relies on *State v. Gonzalez*, 311 N.C. 80, 316 S.E. 2d 229 (1984) and *State v. Owens*, 75 N.C. App. 513, 331 S.E. 2d 311, *disc. rev. denied*, 314 N.C. 546, 335 S.E. 2d 318 (1985). Both these cases are distinguishable from this case. In *Gonzalez* we held it violated the rule of *Bruton* when an extrajudicial statement of a codefendant was received in evidence which said, "I told him I was with two guys, but that I did not rob anyone, they did." We said this implicated the defendant because two men had committed the robbery. In this case A. R. Barnes' statement did not refer to anyone else who was involved in the killing of Jackie Ransom. In *Owens* the Court of Appeals held it was error to admit an extrajudicial statement of a nontestifying codefendant that he picked up the defendant shortly after a robbery because the defendant pointed a gun at him. The Court of Appeals said this placed the defendant near the scene shortly after a robbery with a gun similar to the one used in the robbery. No such incriminating evidence was introduced in this case.

[7]  The defendant Hunt assigns error to the denial of his motions to dismiss the charges of first degree murder of Jackie Ransom and of conspiracy to murder Jackie Ransom. His argument is "that when the test used in *State v. Brown*, 310 N.C. 563, 313 S.E. 2d 585 (1984), is applied to the case at bar regarding the sufficiency of the evidence that a dismissal of the charges as to the murder and conspiracy of Jackie Ransom is required." We believe it takes no discussion of this argument to say that under *Brown* and many other cases decided by this Court that the evidence was sufficient for the jury to find that the defendant Hunt was guilty of the murder and conspiracy to commit the murder of Jackie Ransom.

[8]  The defendant Elwell Barnes contends all the charges against him should have been dismissed. The State's theory was that Elwell aided and abetted in the two murders. A person is guilty of a crime by aiding and abetting in its commission if he is present at the scene of the crime, with the intent to aid the perpetrators in the commission of the offense should his assistance become necessary and such intent was communicated to the actual perpetrators. *State v. Sanders*, 288 N.C. 285, 218 S.E. 2d 352 (1975), *cert. denied*, 423 U.S. 1091, 47 L.Ed. 2d 102 (1976).

Elwell Barnes contends that all the evidence shows he was not actually or constructively present when Henry Lee Hunt killed Jackie Ransom. He argues further that assuming it may be inferred from the evidence he was present at the scene there is no evidence of the actual role he played in the crime. We hold the evidence that Elwell Barnes asked Rogers Locklear whether he could take his brother's place in killing Jackie Ransom, that Elwell Barnes took Rogers Locklear to meet Henry Lee Hunt, that Elwell Barnes and Hunt were together when Rogers Locklear last saw them on the night of the murder, that later that night the two men went to Hunt's trailer, that the next morning Elwell Barnes said he and Hunt had killed Ransom for $2,000, and that he said Hunt had shot Ransom is evidence from which the jury could conclude Elwell Barnes was present when the killing occurred with the intent to aid Hunt in the commission of the offense and Hunt was aware of this intent. It was not error to deny Elwell Barnes' motion to dismiss as to the murder of Jackie Ransom.

[9] Elwell Barnes says of the murder of Larry Jones that the evidence tends to show he may or may not have known of Hunt's intention to kill Larry Jones. He says the murder of Larry Jones was the sole act of Hunt and he did not encourage, command, advise or instigate Hunt to commit the murder. We hold that the evidence that Elwell Barnes was in the automobile when Larry Jones was picked up, that Elwell Barnes was in the automobile when Larry Jones was shot by Hunt, that Elwell Barnes then started to shoot Larry Jones with a shotgun, that Hunt told Elwell Barnes not to shoot Larry Jones and Hunt then shot Larry Jones again, and that Elwell Barnes stood watch while Hunt and Ratley carried Jones' body into the woods and buried it is sufficient evidence for the jury to find Elwell Barnes aided and abetted in the murder of Larry Jones.

[10] Elwell Barnes contends there was not sufficient evidence for the jury to find he conspired to kill either Jackie Ransom or Larry Jones. A conspiracy is an agreement by two or more persons to commit an unlawful act or to do a lawful act by unlawful means. *State v. Horton*, 275 N.C. 651, 170 S.E. 2d 466 (1969), *cert. denied*, 398 U.S. 959, 26 L.Ed. 2d 545 (1970). We hold there was sufficient evidence for the jury to find Elwell Barnes agreed with Hunt and Rogers Locklear to murder Jackie Ransom and that he agreed with Hunt to murder Larry Jones.

As to the charge of conspiracy to murder Jackie Ransom the evidence shows Elwell Barnes asked Rogers Locklear if he could take his brother's place and kill Jackie Ransom. Elwell Barnes then carried Rogers Locklear to Hunt's trailer and after Elwell Barnes had talked privately for a few minutes with Hunt, Hunt told Locklear, "I got the gun. Me and Babe can get the job done." This evidence supported the jury finding that Elwell Barnes agreed with Hunt and Locklear to murder Jackie Ransom. As to the charge of conspiracy to murder Larry Jones there was evidence that Hunt told several people he would kill Larry Jones. Hunt and Barnes were riding in an automobile with Jerome Ratley when they lured Larry Jones into the automobile, took him to a secluded place and killed him. Elwell Barnes then said, "That man was about to cause me to pull a life sentence." This was evidence which supports the jury finding that Elwell Barnes and Hunt agreed to murder Larry Jones. It was not error to deny the motions to dismiss these two charges of conspiracy.

[11]   Defendant Hunt next contends the trial court erred in permitting the district attorney to make improper remarks during his jury arguments. Defendant Hunt did not object to any of these remarks; he contends the trial court should have corrected them *ex mero motu*. In hotly contested cases, counsel are given wide latitude in arguments to the jury and are permitted to argue the evidence which has been presented as well as all reasonable inferences which can be drawn from that evidence. *State v. Holden,* 321 N.C. 125, 362 S.E. 2d 513 (1987), *cert. denied,* --- U.S. ---, 100 L.Ed. 2d 935 (1988). The State's jury argument in capital cases is subject to limited appellate review for the existence of gross improprieties which make it plain that the trial court abused its discretion in failing to correct the prejudicial matters *ex mero motu. Id.*

Defendant Hunt first excepts to this statement made during the district attorney's argument at the guilt phase:

> What you got is cool deliberation. The deliberation, Ladies and Gentlemen of the Jury, of the professional. The deliberation of the professional assassin, the contract killer that the State has proven you are dealing with in this lawsuit.

In *State v. Swink,* 29 N.C. App. 745, 225 S.E. 2d 646 (1976), the Court of Appeals held that it was error for the prosecutor to refer to the defendant as a "professional criminal" in his closing argument. In *State v. Miller,* 271 N.C. 646, 157 S.E. 2d 335 (1967), this Court held that it was error for the prosecutor to argue, in effect, that the defendants were habitual storebreakers. Those cases, however, are distinguishable in two respects from the present case. In each of those cases, the defendant objected to the remark; the defendant in the present case did not do so. More important, the evidence in the present case clearly supports a reasonable inference that defendant Hunt is in fact a "professional assassin." A "professional" is "one that engages in a particular pursuit, study, or science for gain or livelihood." Webster's Third New International Dictionary p. 1811 (1964). An assassin is "one that murders either for hire or from fanatic adherence to a cause." *Id.* at 130. The State's evidence tended to show that Hunt committed a murder for $2,000. There was also evidence that Hunt had said, explaining why he had a glove in his pocket, "If

you had killed as many men as I had, you would have a brown glove in your pocket, too. . . ." We hold that the trial court did not err in failing to intervene *ex mero motu* to correct this remark.

Defendant Hunt next excepts to a portion of the district attorney's closing argument at the penalty phase in which he read quotations from the Bible, including the following: "but. he that smiteth a man so that he dies, he shall surely be put to death," "Who so killeth any person, the murderer shall be put to death by the mouths of witnesses. Moreover, ye shall take no satisfaction for the life of a murderer which is guilty of death, but he shall surely be put to death." The district attorney was merely anticipating any possible reliance by the defense on the commandment "Thou shalt not kill," and arguing that the death penalty is not inconsistent with the Bible. This is a portion of the district attorney's argument:

> What would happen, Ladies and Gentlemen of the Jury, if one of the lawyers gets up here and he picks up this Good Book and he says, ". . . do you know what the Good Book says? It says Thou shalt not kill and that certainly means my client over here but it means . . . you, Ladies and Gentlemen of the Jury." . . . If he starts that, you say "Wait a minute Mr. Lawyer. I want you to read just a few verses down from that Commandment . . . where it says, '. . . but he that smiteth a man so that he die, he shall surely be put to death.'"

In *State v. Brown*, 320 N.C. 179, 358 S.E. 2d 1, *cert. denied*, --- U.S. ---, 98 L.Ed. 2d 406 (1987) and in *State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304 (1983), we held that arguments similar to this one were not so improper as to require intervention by the trial court *ex mero motu*.

Defendant Hunt next excepts to the district attorney's discussion of his previous prison sentences:

> Now, the interesting thing, here, is that he received, according to this Judgment and Commitment, not less than ten nor more than fifteen years on case 155 . . . in case 156? Not less than ten nor more than fifteen years to begin at the expiration, end of the sentence in case 155. . . . And then in

> case 157, he's given ten to fifteen years to begin at the expiration of the sentence in case 156. . . . We are up to thirty to forty-five years in prison.
>
> . . . .
>
> These judgments were entered in 1971 . . . and yet he's out here, now. If he was where these judgments say, Larry Jones would be alive. Jackie Ransom would be alive. . . .

The defendant argues that the district attorney improperly suggested the likelihood that the defendant would be paroled if the jury recommended a life sentence.

A defendant's eligibility for parole is not a proper matter for the jury's consideration. *State v. Brown*, 320 N.C. 179, 358 S.E. 2d 1. However, in the present case, as in *Brown*, the word "parole" was never used, and there was no specific mention of the possibility that a life sentence could mean release in 20 years. We hold that the district attorney's argument did not suggest the possibility of parole in so direct a manner as to amount to a gross impropriety requiring *ex mero motu* intervention by the trial court. *See Brown*. This assignment of error is overruled.

The same reasoning requires us to overrule the defendant Barnes' tenth assignment of error, in which Barnes contends that the trial court should have intervened *ex mero motu* when the district attorney made reference to a previous sentence:

> Had Elwell Barnes, alias Babe, been previously convicted of another capital felony, the answer is obviously yes . . . the judgment says, "it is therefore considered, ordered and adjudged that the said Elwell Barnes be and is hereby sentenced to State's prison for and during the term" . . . get this . . . "of his natural life." And, yet, here he is out in 1981, and within three years, has killed two people. . . . "Natural life," says it right here. What can you depend on with that type of sentence, Ladies and Gentlemen of the Jury?

This argument did not suggest the possibility of parole in so direct a manner as to amount to a gross impropriety requiring *ex mero motu* intervention by the trial court.

[12] Defendant Hunt next contends the trial court committed plain error in that its instructions at both the guilt and penalty

phases were "so complex and confusing that they were incomprehensible to the jury." The defendant does not refer to any specific portions of the instructions, but excepts to all of them.

We find no merit in this assignment of error. Rule 10(b)(2) of the Rules of Appellate Procedure provides, in pertinent part:

> No party may assign as error any portion of the jury charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly that to which he objects and the grounds of his objection; provided that opportunity was given to the party to make the objection out of the hearing of the jury. . . .

In the present case, after the trial court gave its jury instructions at the guilt phase and at the penalty phase, the jurors were sent to the jury room and the trial court asked the lawyers if they had any requests for corrections or additions. Hunt's counsel answered in the negative at the guilt phase, and at the penalty phase requested only one additional instruction, which the trial court gave. Hunt's counsel never objected to any portion of the instructions, or alleged that anything in the instructions was confusing.

Under the plain error rule, an appellate court can review an error that was not brought to the trial court's attention, but only if the error (1) is a fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done, or (2) amounts to a denial of a fundamental right of the accused, or (3) results in a miscarriage of justice, or (4) denies the defendant a fair trial, or (5) seriously affects the fairness, integrity, or public reputation of judicial proceedings, or (6) has a probable impact on the jury's finding that the defendant was guilty. *State v. Odom*, 307 N.C. 655, 300 S.E. 2d 375 (1983). In the present case, however, defendant has not pointed out, nor can we find, anything in the trial court's instructions that amounts to plain error. We further note that the jury never requested any additional instructions or clarifications. This assignment of error is overruled.

[13] The defendant Hunt next contends the court erred at the sentencing phase in allowing the admission of evidence that he had previously been convicted of conspiracy to dynamite a dwell-

ing house and of dynamiting a dwelling house. The State offered this evidence to prove the aggravating factor that the defendant had previously been convicted of a felony involving the use or threat of violence to the person. N.C.G.S. § 15A-2000(e)(3) (1988). After this evidence had been introduced the State was not able to offer any evidence that the house was occupied at the time of the dynamiting. The court then allowed the defendant's motion to strike evidence of the convictions on the ground the dynamitings did not involve a threat to a person. The court instructed the jury not to consider this evidence in the determination of this aggravating circumstance. The State introduced evidence that the defendant had been convicted of three separate charges of armed robbery to support this aggravating circumstance.

We hold that the defendant Hunt was not prejudiced by the admission of the evidence of the dynamiting convictions. The court instructed the jury not to consider it and we assume the jury followed the court's instructions. *State v. Clark*, 298 N.C. 529, 259 S.E. 2d 271 (1979). There was uncontradicted evidence that the defendant Hunt had committed armed robbery. This evidence supports the finding of this aggravating circumstance.

[14] Defendant Elwell Barnes next contends that the trial court erred in submitting to the jury in the Jones case the aggravating factor set out in N.C.G.S. § 15A-2000(e)(4):

> (4) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.

The defendant argues that the submission of this factor was erroneous for three reasons. First, the defendant claims the evidence does not support a finding of this factor. We disagree. The evidence, when viewed in a light most favorable to the State, raises more than a reasonable inference that Barnes aided and abetted Hunt in killing Jones in order to avoid being arrested for the murder of Jackie Ransom. Especially important is the evidence that Barnes was well aware that Jones was talking to people about the murder of Jackie Ransom, and the evidence that Barnes stated after the killing, "That man was about to cause me to pull a life sentence."

Second, defendant Barnes argues that N.C.G.S. § 15A-2000(e)(4) "is overbroad as interpreted and applied in this case."

The defendant argues that the factor should not be submitted unless the person killed was either a police officer trying to effect a lawful arrest, or a victim of the original offense, or a witness to the original offense. The defendant cites no legal authority for this proposition, and we find no merit in it. Under the plain language of the statute, the factor is applicable whenever the murder was committed in order to avoid arrest, not only in the three situations specified by the defendant. In the present case, the person killed was talking with law enforcement personnel about the murder of Jackie Ransom, and the defendant knew he was talking about it. The evidence shows that he was killed to avoid arrest.

Third, defendant Barnes argues that the submission of this aggravating factor violates the merger rule as set forth in *State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551 (1979), *cert. denied*, 446 U.S. 941, 64 L.Ed. 2d 796 (1980): "when a defendant is convicted of first degree murder under the felony murder rule, the trial judge shall not submit to the jury at the sentencing phase of the trial the aggravating circumstance concerning the underlying felony." *Id.* at 113, 257 S.E. 2d at 568. The defendant's argument has no merit; the *Cherry* rule has no bearing on the present case, because defendant was convicted of first degree murder based not on the felony murder rule, but on the theory that he aided and abetted a premeditated and deliberated killing. Elwell Barnes also contends that the State prosecuted him for the murder of Larry Jones on the theory that he aided and abetted Henry Lee Hunt in the murder of Larry Jones for the purpose of avoiding arrest for the murder of Jackie Ransom. He contends that under *Cherry* this motive merged into the murder and cannot be used as an aggravating circumstance. The motive of the defendant is not an element of the crime and *Cherry* does not preclude its use as an aggravating circumstance.

[15] Defendant Barnes further contends that the trial court committed error when it instructed the jury that in order to find the aggravating factor specified in N.C.G.S. § 15A-2000(e)(4), the jury must find that "when Elwell Barnes aided or abetted Henry Lee Hunt in the killing of Larry Jones, that he did so with the purpose to avoid and prevent his arrest or the arrest of Henry Lee Hunt for the killing of Larry Jones—for the killing of Jackie Ransom." The defendant argues that this instruction would allow the

jury to find the aggravating factor if they found that Barnes acted with the purpose to avoid either his arrest or Hunt's arrest, for the murder of either Ransom or Jones. The defendant claims the jury should only have been permitted to find the factor if Barnes acted with the purpose of avoiding *his own* arrest for the murder of Ransom.

We disagree. First, when the judge said "for the killing of Larry Jones" he made a verbal error, which he quickly corrected by saying "for the killing of Jackie Ransom." Second, it was not error to instruct the jury to find the factor whether they found that Barnes acted to prevent his own arrest *or* to prevent Hunt's arrest. N.C.G.S. § 15A-2000(e)(4) reads in part, "for the purpose of avoiding or preventing *a* lawful arrest. . . ." (Emphasis added.) It need not be the defendant's own arrest. In the present case, there was evidence that Barnes acted with the purpose of preventing both his arrest and Hunt's arrest. This assignment of error is overruled.

[16] Defendant Barnes next contends that the trial court committed plain error in submitting to the jury in the Ransom case the aggravating factor set out in N.C.G.S. § 15A-2000(e)(6): "The capital felony was committed for pecuniary gain." The defendant argues that the evidence is insufficient to support a finding that he aided and abetted Hunt in the murder for pecuniary gain. We disagree. There is evidence that when Rogers Locklear went to A. R. Barnes' house on 8 September 1984, defendant Elwell Barnes asked Locklear if he would let him take A. R.'s place, and if he would pay him the same amount he had offered to A. R. The next morning, after the murder, when Bernice Cummings asked Elwell Barnes why he and Hunt killed Ransom, Barnes replied "for two thousand dollars." This evidence is sufficient to support a finding of the pecuniary gain aggravating factor; the defendant's assignment of error is overruled.

[17] Defendant Elwell Barnes next assigns error to what he contends is the court's failure to comply with *Enmund v. Florida*, 458 U.S. 782, 73 L.Ed. 2d 1140 (1982). *Enmund* dealt with a felony murder. The United States Supreme Court held that an aider and abettor to a robbery in which the victims were killed could not be executed when all the evidence showed he did not intend that the victims be killed. In this case the evidence showed Elwell Barnes

was an aider and abettor in two murders which were committed with premeditation and deliberation. He intended that the victims be killed. *Enmund* does not apply.

[18]  The defendant Elwell Barnes next contends that the death penalty as applied in this State is unconstitutional because the jury is not given proper guidance in considering aggravating and mitigating circumstances. He bases this argument on the way the jury is instructed to apply N.C.G.S. § 15A-2000(b) pursuant to *State v. McDougall*, 308 N.C. 1, 301 S.E. 2d 308, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 173 (1983). The court used the charge suggested by *McDougall* in this case. Four issues were submitted to the jury. The third issue was as follows:

> Do you find beyond a reasonable doubt that the mitigating circumstance or circumstances you have found is, or are, insufficient to outweigh the aggravating circumstance you have found?

The defendant says this issue is deficient because if the jury is in equipoise it must answer the issue "yes" and impose the death penalty. We do not believe the defendant Barnes' analysis of the issue is correct. If the jury must be satisfied beyond a reasonable doubt before finding the mitigating circumstances are insufficient to outweigh the aggravating circumstances and the jury is in a state of equipoise as to the issue it would answer the issue "no." We hold the issue was properly submitted.

Both defendants argue that it was error for the court to charge the jury that they must be unanimous before they could find a mitigating circumstance. The defendants base this argument on *Mills v. Maryland*, --- U.S. ---, 100 L.Ed. 2d 384 (1988), which dealt with the finding of mitigating circumstances in a capital case. For the reasons stated in *State v. McKoy*, 323 N.C. 1, 372 S.E. 2d 12 (1988), we overrule this assignment of error.

[19, 20, 21]  The defendants argue under separate assignments of error eleven issues which they recognize have been decided against their positions in previous cases. Each of the defendants asks that we find error because (1) he was not provided a bill of particulars regarding aggravating factors upon which the State would rely, (2) the death penalty is unconstitutional, and (3) the court placed the burden of proving mitigating circumstances on

the defendants. Defendant Hunt asks that we find error for (1) the denial of his motion to appear as co-counsel, (2) the denial of his motion for disclosure or impeaching or exculpatory information, (3) for allowing the prosecutor to "death qualify" the jury, and (4) for instructing the jury that they had a duty to recommend death under certain circumstances. Defendant Barnes asks that we find error because (1) the court denied his motion for individual voir dire and the sequestration of the jurors, (2) the court ruled that jurors could be excused for cause if they could not under any circumstances impose the death penalty, (3) the court instructed the jury that it had a duty to return a recommendation of death if it found that the aggravating circumstances, in light of the mitigating circumstances, were sufficiently substantial to call for the death penalty, and (4) because N.C.G.S. § 15A-2000 is unconstitutional on its face and as applied in this case. The defendants concede that this Court has previously decided all these issues against their positions. These assignments of error are overruled.

## Proportionality Review

[22]  Having determined there is no error in the guilt or penalty phase of the trial sufficient to require a new trial or sentencing hearing, we are required by N.C.G.S. § 15A-2000(d)(2) to determine (1) whether the record supports the jury's finding of the aggravating circumstances upon which the sentence of death was imposed, (2) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor, and (3) whether the sentence is excessive or disproportionate to the penalty imposed in the pool of similar cases, considering both the crime and the defendant.

The jury found as to Henry Lee Hunt two aggravating circumstances in the murder of Jackie Ransom. These were that he had previously been convicted of a felony involving the threat of violence to the person and that the murder of Jackie Ransom was for pecuniary gain. The jury found two aggravating circumstances in the murder of Larry Jones by Henry Lee Hunt. These were that he had been previously convicted of a felony involving a threat of violence to the person and that the murder was committed for the purpose of avoiding or preventing a lawful arrest. The jury found as to Elwell Barnes two aggravating circumstances in the murder of Jackie Ransom. These were that he had previously

been convicted of a capital felony and the murder was committed for pecuniary gain. The jury found two aggravating circumstances in the murder of Larry Jones by Elwell Barnes. These were that he had previously been convicted of a capital felony and that the murder of Larry Jones was committed for the purpose of avoiding or preventing a lawful arrest. The record supports the finding of these aggravating circumstances.

Elwell Barnes contends that the death sentence was imposed upon him under the influence of passion, prejudice and other arbitrary factors because of certain questions asked by the prosecuting attorney on the jury voir dire and on cross-examination of a witness for Elwell Barnes. The district attorney asked each juror a question as to whether they could be a part of the "legal machinery" which might impose the death penalty in this case. Elwell Barnes says this committed the jury to impose the death penalty before hearing any evidence. We do not believe such an inference is properly made from these questions. The district attorney had a right to question the jurors as to their views on the death penalty and these were proper questions. We certainly cannot hold that the questions so inflamed the jury that the verdict was rendered under the influence of passion, prejudice, or any other arbitrary factor. A psychiatrist testified for Elwell Barnes that he had an IQ of 68 which indicated his abilities are in the upper range of mild retardation. He characterized Elwell Barnes as a "follower." On cross-examination the psychiatrist was asked about a letter he had written to Elwell Barnes' attorney in which he said he did not find any mitigating circumstances. Elwell Barnes says the jury must have believed the psychiatrist because they found no mitigating circumstances. If the jury believed the testimony of the psychiatrist this does not show they were under the influence of passion, prejudice or other arbitrary factor in reaching a verdict.

We can find no indication that the death penalty was imposed on either defendant under the influence of passion, prejudice or other arbitrary factor. We also hold that the record clearly supports the submission of the aggravating circumstances considered and found by the jury.

We now turn to our statutory duty of a proportionality review. This requires us to determine whether juries in this state

have been consistently returning death sentences in similar cases considering the crimes and the defendants. *See State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 177 (1983) and *State v. Lawson*, 310 N.C. 632, 314 S.E. 2d 493 (1984), *cert. denied*, 471 U.S. 1120, 86 L.Ed. 2d 267 (1985). If this comparison reveals juries have consistently been returning death sentences in similar cases then we will have a strong basis for concluding the death sentences imposed in this case were not disproportionate.

We deal first with the murder of Jackie Ransom by Elwell Barnes. The jury found two aggravating circumstances, that Elwell Barnes had previously been convicted of another capital felony and the murder of Jackie Ransom was committed for pecuniary gain. Four mitigating circumstances were submitted to the jury. The jury did not find three of the mitigating circumstances submitted which were (1) the murder was actually committed by Hunt and Elwell Barnes was only an accomplice and his participation was relatively minor, (2) Elwell Barnes was under the domination of another person, and (3) Elwell Barnes has an IQ of 68 which impairs his ability to perform intellectual functions, and which impairs his judgment and insight in everyday living. The jury found as a mitigating circumstance, "Any other circumstance or circumstances arising from the evidence which you the jury deem to have mitigating value."

Elwell Barnes, relying on four cases involving contract killings which are *State v. Lowery*, 318 N.C. 54, 347 S.E. 2d 729 (1986); *State v. Hinson*, 310 N.C. 245, 311 S.E. 2d 256, *cert. denied*, 469 U.S. 839, 83 L.Ed. 2d 78 (1984); *State v. Woods*, 307 N.C. 213, 297 S.E. 2d 574 (1982); and *State v. Parton*, 303 N.C. 55, 277 S.E. 2d 410 (1981), argues that in none of these cases did the jury impose the death penalty and these cases are the most similar of the cases in the pool to this case. We note that in *State v. McLaughlin*, 323 N.C. 68, 372 S.E. 2d 49 (1988), we affirmed the death penalty in a contract murder case. In comparing this case with those in the pool it is worth noting that this is more than a contract killing case. The jury found that Elwell Barnes had previously been convicted of a capital crime and that he murdered again within a few days of the murder of Jackie Ransom. This is similar to *State v. Robbins*, 319 N.C. 465, 356 S.E. 2d 279, *cert. denied*, --- U.S. ---, 98 L.Ed. 2d 226 (1987), in which we affirmed

the death penalty. We have not found a case factually similar to this one but upon a review of the cases in the pool we have no trouble affirming the death sentence. This was a brutal murder of a man Elwell Barnes did not know. He was anxious to participate in the murder. The murder was committed for pecuniary gain. The defendant had previously been convicted of a capital crime and he committed another murder not long after the murder of Jackie Ransom. Considering the nature of the crime and the character of the defendant, we hold the death penalty was not disproportionate.

We deal next with the murder of Larry Jones by Elwell Barnes. Two aggravating circumstances were found by the jury. They were that Elwell Barnes had previously been convicted of a capital crime and that the murder was committed to prevent or avoid lawful arrest. The same mitigating circumstances were submitted in the Jones murder as were submitted in the Ransom murder and again the jury found only one unspecified mitigating circumstance.

This case involves a murder to eliminate a possible witness against the defendant. In *State v. Maynard*, 311 N.C. 1, 316 S.E. 2d 197 (1984); *State v. Lawson*, 310 N.C. 632, 314 S.E. 2d 493 (1984), *cert. denied*, 471 U.S. 1120, 86 L.Ed. 2d 267 (1985); *State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304 (1983); and *State v. Barfield*, 298 N.C. 306, 259 S.E. 2d 510 (1979), *cert. denied*, 448 U.S. 907, 65 L.Ed. 2d 1137 (1980), juries imposed death penalties in cases involving witness elimination, which were affirmed by this Court. In *State v. Pridgen*, 313 N.C. 80, 326 S.E. 2d 618 (1985) and *State v. Crawford*, 301 N.C. 212, 270 S.E. 2d 102 (1980), the juries recommended life sentences in cases involving witness elimination. We believe this shows juries have been consistently imposing the death penalty in murder cases involving witness elimination.

In this case, in addition to finding that the defendant had committed the murder to avoid lawful arrest, the jury also found he had previously been convicted of a capital felony. The jury found him guilty of another murder committed six days prior to the murder of Larry Jones. The murder of Larry Jones was calculated. The defendant showed no remorse. The imposition of the death penalty was not disproportionate.

We deal next with the murder of Jackie Ransom by Henry Lee Hunt. The same consideration applies to him as to Elwell Barnes. This was a contract killing and more. The jury found that he had previously been convicted of a felony involving the threat of violence to the person. The jury found that he murdered a second person within a week of the murder of Jackie Ransom. He showed no remorse for the killing. The death sentence was not disproportionate.

As to the murder of Larry Jones by Henry Lee Hunt, again the same consideration applies to Henry Lee Hunt as to Elwell Barnes. Juries have been consistently returning death sentences in witness elimination murders and this case is more than a witness elimination murder. The defendant had murdered another person six days before he murdered Larry Jones. He showed no remorse for the murder of Larry Jones. The death sentence was not disproportionate.

In the trial of both defendants, we find

No error.

Chief Justice EXUM concurring.

I concur with the majority's treatment of all issues in the guilt and sentencing phases of this trial.

If, in the sentencing phase, the Court were addressing the unanimity instruction issue for the first time, I would agree with defendant's position that these instructions violate the Eighth Amendment to the federal constitution as that amendment was interpreted in *Mills v. Maryland*, 486 U.S. ---, 100 L.Ed. 2d 384 (1988), for the reasons stated in my dissenting opinions in *State v. McKoy*, 323 N.C. 1, 372 S.E. 2d 12 (1988), and *State v. Allen*, 323 N.C. 208, 372 S.E. 2d 855 (1988). The majority's position on this issue is, as a result of the Court's decisions in *McKoy* and *Allen*, the law of this state to which I am now bound. For this reason I concur with the majority's treatment of this issue.

Justice FRYE dissenting as to sentence.

For the reasons expressed in the Chief Justice's dissenting opinions in *State v. McKoy*, 323 N.C. 1, 372 S.E. 2d 12 and in

*State v. Allen*, 323 N.C. 208, 372 S.E. 2d 855 (1988), I believe the United States Supreme Court's decision in *Mills v. Maryland*, 486 U.S. ---, 100 L.Ed. 2d 384 (1988), requires that defendants be given new sentencing hearings. Accordingly, I dissent from that portion of the Court's opinion which rejects defendants' arguments based upon the holding of *Mills*. I concur in the result reached by the majority on the guilt phase issues.