STATE OF NORTH CAROLINA v. HENRY LEE HUNT

No. 5A86

(Filed 10 January 1992)

**1. Criminal Law § 1352 (NCI4th) — McKoy error — harmless error analysis**

A *McKoy* error in a capital sentencing proceeding is subject to harmless error analysis.

**Am Jur 2d, Criminal Law § 600; Homicide § 548; Trial § 1754.**

**Unanimity as to punishment in criminal case where jury can recommend lesser penalty. 1 ALR3d 1461.**

STATE v. HUNT

[330 N.C. 501 (1992)]

2. **Criminal Law § 1363 (NCI4th)— capital sentencing proceeding—solicitation of murder by others—no mitigating value**

The fact that others solicited defendant's killing of the first victim had no mitigating value in this sentencing proceeding for two first degree murders where defendant was hired to kill the first victim and killed the second victim to eliminate him as a witness to the first killing; defendant was the dominant actor in the actual killings and the most culpable of all the parties involved; there was evidence that defendant thought little of taking a human life, threatened to kill those who hired him if he was not paid within a certain time, and attempted to arrange the murder of a witness to the second killing; and the jury found as aggravating circumstances that defendant had previously been convicted of a felony involving the threat of violence to the person, that the first murder was committed for pecuniary gain, and that the second murder was committed to avoid or prevent a lawful arrest.

**Am Jur 2d, Criminal Law §§ 598, 599; Homicide § 554; Trial § 1760.**

3. **Criminal Law § 1363 (NCI4th)— capital sentencing proceeding—recanted confession by codefendant's brother—no mitigating value**

Recanted statements by a codefendant's brother that he killed one victim during an argument and in self-defense could not have been found by a reasonable juror to have mitigating value in this capital sentencing proceeding where all the evidence tended to show that the codefendant's brother falsely confessed to the killing to protect his brother, and it is clear that the jury disbelieved this evidence because it unanimously rejected this evidence by its guilt phase verdict.

**Am Jur 2d, Criminal Law §§ 598, 599; Homicide § 554; Trial § 1760.**

4. **Criminal Law § 1363 (NCI4th)— capital sentencing proceeding—absence of psychological torment or physical torture—no mitigating value**

No reasonable juror could have found the absence of evidence that either victim was psychologically tormented or physically tortured before they died to have mitigating value in this capital sentencing proceeding since the mere absence

of evidence to establish an aggravating circumstance does not present a mitigating one; there were no details that would legitimately warrant a reasonable juror in finding the absence of psychological torment in the killing of the first victim; and the evidence contradicts such a contention as to the second killing in that the evidence firmly established that the second victim lived for some time between being shot in the car and being shot on the ground, and it would be pure speculation to argue that this victim did not overhear defendant and the codefendant arguing over how to finish him off as he lay there begging.

**Am Jur 2d, Criminal Law §§ 598, 599; Homicide § 554; Trial § 1760.**

5. **Criminal Law § 1361 (NCI4th)— capital sentencing proceeding—impaired capacity mitigating circumstance—intoxication—insufficient evidence**

No reasonable juror could have found as a mitigating circumstance for two first degree murders that defendant was a heavy drinker and had consumed a large amount of alcohol during the weekend of the murders and that his alcohol consumption impaired his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law where there was no evidence that defendant drank any alcoholic beverages before the first murder; the evidence showed that on the day the second victim was killed defendant and two others consumed less that one-half of a fifth of whiskey; there was no evidence as to how much of this whiskey defendant actually consumed; and there was thus nothing in the record which would permit the jury to speculate as to the effect that defendant's alcohol consumption had on his abilities.

**Am Jur 2d, Criminal Law §§ 598, 599; Homicide § 554; Trial § 1760.**

6. **Criminal Law § 1363 (NCI4th)— capital sentencing proceeding—mitigating circumstance—uneducated and poor defendant—insufficient evidence**

No reasonable juror could have found as a mitigating circumstance for two first degree murders that defendant was an uneducated man with a background of poverty and disadvantage where no evidence to this effect was presented by

any party, and the record does not indicate that the jury ever heard defendant utter a word during the entire trial.

**Am Jur 2d, Criminal Law §§ 598, 599; Homicide § 554; Trial § 1760.**

7. **Criminal Law § 1363 (NCI4th) — capital sentencing proceeding — regret or remorse as mitigating circumstance — insufficient evidence**

No reasonable juror could have found as a mitigating circumstance for two first degree murders that defendant was regretful and remorseful for the murders based on observations of defendant's demeanor where defendant did not take the stand, did not present any evidence at the penalty phase, and did not argue his demeanor to the jury; and all the evidence and references to defendant's demeanor in the record indicate that he was not regretful or remorseful and that he had told a witness that he was not sorry that he had killed the second victim.

**Am Jur 2d, Criminal Law §§ 598, 599; Homicide § 554; Trial § 1760.**

8. **Criminal Law § 1352 (NCI3d) — capital sentencing proceeding — harmlessness of McKoy error**

A *McKoy* error in a capital sentencing proceeding was harmless beyond a reasonable doubt where only the "catchall" mitigating circumstance was submitted to and not found by the jury, and there was no mitigating evidence offered or arising from the evidence presented which would support a finding of this mitigating circumstance.

**Am Jur 2d, Criminal Law § 600; Homicide § 548; Trial § 1754.**

**Unanimity as to verdict in criminal case where jury can recommend lesser penalty. 1 ALR3d 1461.**

ON remand by the United States Supreme Court, 494 U.S. 1022, 108 L. Ed. 2d 602 (1990), for further consideration in light of *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990). Heard on remand in the Supreme Court 12 September 1991.

STATE v. HUNT

[330 N.C. 501 (1992)]

*Lacy H. Thornburg, Attorney General, by G. Patrick Murphy, Assistant Attorney General, for the State.*

*D. Stuart Meiklejohn for defendant-appellant.*

MEYER, Justice.

Defendant was convicted of the first-degree murders of Jackie Ray Ransom and Larry Jones and was sentenced to two death sentences. After oral arguments were heard by this Court but before we rendered an opinion, we entered an order directing the State and defendant to file supplemental briefs addressing the effect, if any, of the decision of the United States Supreme Court in *Mills v. Maryland,* 486 U.S. 367, 100 L. Ed. 2d 384 (1988). *State v. Hunt,* 322 N.C. 474, 370 S.E.2d 239 (1988). This Court found no error in either the guilt or sentencing phases of defendant's trial. *State v. Hunt,* 323 N.C. 407, 373 S.E.2d 400 (1988).

Subsequently, the United States Supreme Court vacated the judgment and remanded the case to this Court for further consideration in light of its decision in *McKoy v. North Carolina,* 494 U.S. 433, 108 L. Ed. 2d 369. *Hunt v. North Carolina,* 494 U.S. 1022, 108 L. Ed. 2d 602 (1990). On 3 October 1990, this Court ordered the parties to file supplemental briefs addressing the *McKoy* issue. *State v. Hunt,* 327 N.C. 476, 397 S.E.2d 229 (1990).

Our review of the record on appeal reveals, and the State concedes, that the unanimity instructions that the jury received with regard to mitigating circumstances are virtually identical to the instructions found unconstitutional in *McKoy v. North Carolina,* 494 U.S. 433, 108 L. Ed. 2d 369. Specifically, the trial court instructed the jury to answer each mitigating circumstance "no" if it did not find the circumstance unanimously.

The sole issue presented on this appeal is whether the *McKoy* error was harmless in this case. As we have previously noted, *McKoy* error "is one of federal constitutional dimension, and the State has the burden to demonstrate its harmlessness beyond a reasonable doubt." *State v. McKoy,* 327 N.C. 31, 44, 394 S.E.2d 426, 433 (1990) (relying on N.C.G.S. § 15A-1443(b) (1988) ). For the reasons stated below, we conclude that the State has succeeded in carrying its burden, and we affirm defendant's sentences of death.

Defendant, together with his codefendant, Elwell Barnes, was tried and convicted of the murders and conspiracies to murder

STATE v. HUNT

[330 N.C. 501 (1992)]

Jackie Ransom and Larry Jones in a contract and witness elimination killing and was sentenced to two death sentences for the murders and to terms of years for the two conspiracies. The evidence supporting defendant's convictions and sentences is set forth in our previous opinion, *State v. Hunt*, 323 N.C. 407, 373 S.E.2d 400, and is only briefly summarized here.

Defendant Henry Lee Hunt, Elwell Barnes, and A.R. Barnes were tried for the murder and conspiracy to commit the murder of Jackie Ransom. In the same trial, defendant and Elwell Barnes were tried for the murder and conspiracy to commit the murder of Larry Jones.

Evidence at defendant's trial tended to show that Dottie Locklear Ransom had first married Rogers Locklear. Locklear was a construction worker and often worked out of town for several days at a time. Dottie began seeing Jackie Ransom while Locklear was out of town. She eventually married him, although she never divorced Locklear.

In July 1984, Dottie asked Locklear about the possibility of insuring Ransom's life and then having him killed. She purchased a $25,000 life insurance policy and asked Locklear to find a hit man to kill Ransom. Locklear asked his brother Harry, but Harry refused and told Locklear that if he wanted a hit man, he should see A.R. Barnes.

In August, Locklear met A.R. Barnes and, after some negotiation, Locklear and Dottie agreed to pay A.R. Barnes $2,000 to kill Jackie Ransom. A.R. Barnes said, "If I don't kill him, . . . I'll get it done."

On 8 September, Locklear went to A.R. Barnes' house, did not see him, but saw his brother, Elwell "Babe" Barnes. Elwell Barnes asked Locklear if he could take his brother's place and kill Ransom for the same compensation Locklear had promised his brother. Locklear replied that it was up to him. Elwell Barnes then told Locklear to drive him to defendant's home. Elwell Barnes talked with defendant privately for about ten minutes. Defendant told Locklear, "I got the gun. . . . Me and Babe can get the job done." After Locklear pointed out Jackie Ransom, defendant told Locklear to get Dottie and take her to a place where there would be witnesses. Ransom was killed that night, and his body was placed in a shallow grave where it was found the next day.

STATE v. HUNT

[330 N.C. 501 (1992)]

The morning after Ransom was killed, Bernice Cummings, who lived with defendant at his mobile home, asked Elwell Barnes where he and defendant had been the night before. Elwell Barnes replied that defendant had killed Jackie Ransom.

Later that day, defendant told Locklear, "I killed Jackie last night." He said he wanted his money in thirty days and threatened to kill both Dottie and Locklear if he did not get it.

The next day, defendant was informed that Larry Jones had been speaking with the authorities about Ransom's death. He told Elwell Barnes that "Jones was running his mouth" and that he would "put a stop to his damn mouth." A few days later, defendant also told Bernice Cummings that he was going to "kill that water-headed, ratting son-of-a-bitch Larry Jones" and wanted to get a shovel so he could "bury him where he never could be found." Again, defendant stated that Jones had been running his mouth. Defendant obtained a shovel and a shotgun and then told Aganora, defendant's sister who lived with Larry Jones, and Cummings that he was going to kill Larry Jones because Jones knew he killed Jackie Ransom.

Later that day, defendant and Elwell Barnes were riding in an automobile driven by Jerome Ratley when they picked up Jones. Defendant told Ratley to turn onto a dirt road and instructed him to stop the car and turn the lights off. Then, defendant turned around and shot Jones in the chest several times. Defendant said, "You don't eat no more cheese for no damn body else. I'll meet you in heaven or hell, one." Defendant then pulled Jones out of the car, and Elwell Barnes got the shotgun from the trunk. Jones started mumbling "Mule, Mule, Mule," referring to defendant. Elwell Barnes pointed the shotgun at Jones' head. Defendant said, "Don't shoot him with the shotgun," and shot Ransom with the pistol several more times. Elwell Barnes kept a lookout while defendant and Ratley dragged Jones' body into the woods about a hundred yards and buried him in a shallow grave.

On 16 September, defendant told Cummings that he had carried Larry Jones to where he would never be found.

Defendant gave the pistol to his son-in-law after the murders. While in jail, defendant told his son-in-law that he had killed Ransom and Jones. He also told him to get rid of the gun and to get

his brother to "get rid of the black guy," meaning Jerome Ratley, because "[h]e's the one that can hurt me most."

At the close of all the evidence, the trial court granted a mistrial as to A.R. Barnes. The jury returned verdicts of guilty on all counts as to defendant and Elwell Barnes. The trial court then conducted a sentencing proceeding pursuant to N.C.G.S. § 15A-2000.

During the sentencing proceeding, the State, in addition to relying upon the evidence admitted during the guilt phase of defendant's trial, presented evidence showing that defendant had previously been convicted of four felony charges. This evidence was presented through the testimony of Sue Gaines, Deputy Clerk of Superior Court, Robeson County. Three of these prior convictions were for armed robbery, and the fourth was for conspiracy to dynamite a dwelling.

Defendant presented no evidence during the sentencing phase. He did not cross-examine State's witness Ms. Gaines or any of the witnesses that his codefendant, Elwell Barnes, tendered during his presentation of mitigating evidence.

On the Issues and Recommendation forms, the trial court submitted two aggravating circumstances as to each murder. In the murder of Jackie Ransom, the jury was asked the following:

(1) Had Henry Lee Hunt been previously convicted of a felony involving the threat of violence to the person? [N.C.G.S. § 15A-2000(e)(3).]

. . . .

(2) Was this murder committed for pecuniary gain? [N.C.G.S. § 15A-2000(e)(6).]

The jury answered "yes" to both questions. In the murder of Larry Jones, the jury was asked the following:

(1) Had Henry Lee Hunt been previously convicted of a felony involving the threat of violence to the person? [N.C.G.S. § 15A-2000(e)(3).]

. . . .

(2) Was this murder committed for the purpose of avoiding or preventing a lawful arrest? [N.C.G.S. § 15A-2000(e)(4).]

Again, the jury answered "yes" to both questions.

Under Issue Two of each punishment recommendation form, the trial court submitted only the "catchall" mitigating circumstance, which read: "Any circumstance or circumstances arising from the evidence which you the jury deem to have mitigating value." In each case against defendant, the jury responded "no" to Issue Two, indicating that it found no evidence of mitigating value.

As a result of these findings and after concluding that the aggravating circumstances were sufficiently substantial to call for the death penalty, the jury recommended that defendant be sentenced to death in each case. The trial court entered judgment accordingly, sentencing defendant to two death sentences.

On his appeal to this Court, defendant argues: I. the unanimity instruction regarding mitigating circumstances was constitutionally defective under *McKoy*; and II. the unconstitutional unanimity instruction cannot be regarded as harmless error because A. harmless error analysis is inapplicable to *McKoy* error, and B. the State cannot prove beyond a reasonable doubt that the error was harmless because, though defendant presented no evidence at the sentencing phase, there was evidence to support the catchall mitigating circumstance which the jury failed to find.

I.

The State concedes that the instruction concerning the unanimity requirement for mitigating circumstances given by the trial court in this case was virtually identical to the one found constitutionally defective in *McKoy*. We so conclude and find that the instructions in that regard were erroneous.

II.

The question we must address is whether that error was harmless beyond a reasonable doubt. The State contends that defendant's failure to present any evidence to challenge the substantial evidence proffered by the State in support of the aggravating circumstances submitted and defendant's failure to present any evidence in mitigation, coupled with the language of the catchall mitigating circumstance submitted, requiring that any such cir-

cumstance be one "arising from the evidence," renders the erroneous unanimity instruction harmless. We agree.

## A.

[1] Defendant first contends that harmless error analysis is inapplicable to the unanimity instruction found to be constitutionally erroneous in *McKoy*. This Court has specifically held to the contrary in *State v. McKoy*, 327 N.C. 31, 44, 394 S.E.2d 426, 433 (1990). *See also State v. Laws*, 328 N.C. 550, 402 S.E.2d 573, *cert. denied*, --- U.S. ---, 116 L. Ed. 2d 174 (1991), *reh'g denied*, --- U.S. ---, 116 L. Ed. 2d 648 (1991); *State v. Roper*, 328 N.C. 337, 402 S.E.2d 600 (1991).

## B.

Defendant contends that had the jury not been given the constitutionally defective unanimity instruction, it might have answered "yes" to the catchall mitigating circumstance and therefore might have reached a different result in its sentencing recommendation. Defendant suggests that the following evidence could support a finding by one or more jurors of the catchall circumstance: (1) the fact that persons other than the defendant were instigators of the crime; (2) the fact that the jury was told that A.R. Barnes had confessed to killing Jackie Ransom, although it was also told that he had retracted that confession; (3) the fact that there was no evidence that defendant psychologically tormented or physically tortured the victims before they died; (4) the fact that defendant was a heavy drinker and had consumed a quantity of alcohol during the weekend the murders were committed; (5) the fact that it was obvious to the jury that defendant was an uneducated man, who had a background of poverty and disadvantage; and (6) the fact that although defendant presented no evidence, the jury could observe his demeanor and gather that defendant showed regret and remorse.

We now address the evidence with regard to those contentions seriatim:

## 1.

[2] Although the evidence in this case showed that the murder of Jackie Ransom was instigated by Locklear and Dottie, this evidence pales in comparison to the evidence concerning defendant's involvement in these and other murders. In viewing the

evidence presented by the State in both phases of defendant's trial, it becomes clear that defendant was a hired assassin, a contract killer. It took only a ten-minute conversation with Elwell Barnes the day before the murders and the promised payment of $2,000 to persuade defendant to kill Ransom. He carried out the terms of his contract, killing Ransom with a shot to the head, and later killed Larry Jones to eliminate Jones as a potential witness to the Ransom murder.

The murder of Larry Jones was also very revealing of defendant's reprehensible character. When defendant learned that "Jones was running his mouth" about the Ransom murder, he responded by declaring that he was "going to put a stop to his damn mouth." Several days later, defendant went to get a shovel with which to dig a grave for Jones; he told Cummings that he was going to "kill that water-headed, ratting son-of-a-bitch Larry Jones." When defendant shot Jones several times, he said to Jones, "You don't eat no more cheese for no damn body else. I'll meet you in heaven or hell, one."

The evidence of defendant's callous attitude was not confined to these two murders. The jury also heard at trial evidence that defendant thought little of the taking of a human life. Locklear testified that prior to the Ransom murder, he had asked defendant why he carried a brown glove in his pocket. Defendant replied, "If you had killed as many men as I had [sic], you would have a brown glove in your pocket, too; wouldn't he Babe." There was also evidence that defendant, after killing Ransom, threatened to kill Locklear and Dottie if he did not receive the money he had been promised within one month. After his arrest, while he was being held in Central Prison awaiting trial, defendant attempted to make arrangements to eliminate another potential witness. Defendant told his son-in-law, Jim Freeman, to get a message to defendant's brother, Wilbert, to "get rid of the black guy" (Jerome Ratley) because Ratley was the only one who could really hurt him at trial. From this evidence, defendant's penchant for killing was made obvious to the jury.

The evidence in this case clearly established defendant's culpability for the murders of Ransom and Jones. The morning after defendant killed Ransom, Elwell Barnes told defendant's girlfriend, Bernice Cummings, that he and defendant had killed Ransom the night before. That same morning, defendant reported

the same information to Locklear. The jury heard three witnesses (Cummings, Locklear, and Freeman) testify that Hunt admitted killing Ransom. Two of these witnesses had a close relationship with defendant. Ratley, an eyewitness to the killing of Jones, also testified that he saw defendant fire several shots at Jones; that he, at defendant's command, helped pull Jones out of the car; that he watched defendant fire several more shots at Jones; and that they then dragged Jones' body into the woods to be buried. In addition, defendant's .25-caliber Beretta, which he gave to Freeman to get rid of after the murders, was linked by a ballistics expert to the projectiles removed from both victims. Simply put, the evidence of defendant's guilt in this case is overwhelming.

While the chain of evidence in this case makes it clear that, with respect to the Ransom killing, Locklear and Dottie were the instigators of the plot to kill Jackie Ransom, defendant was the dominant actor in the actual killings and clearly the most culpable of all the parties involved. The fact that others solicited defendant's act but did not participate in the killings has no mitigating value under the facts of this case. Considering defendant's dangerous character, his willingness to kill not only the party he contracted to kill, but also to kill others in order to eliminate probable witnesses, as well as the aggravating circumstances found by the jury and the lack of mitigating value of the fact that others solicited the killing of Ransom, we are entirely satisfied that no reasonable juror would have recommended a life sentence based upon such a mitigating circumstance. We are fortified in our conclusion by our experience that in the overwhelming majority of cases involving contract killings, juries returned recommendations of death. *State v. Robinson*, 327 N.C. 346, 395 S.E.2d 402 (1990); *State v. Brown*, 327 N.C. 1, 394 S.E.2d 434 (1990); *State v. Hunt*, 323 N.C. 407, 373 S.E.2d 400 (1988), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 602 (1990); *State v. McLaughlin*, 323 N.C. 68, 372 S.E.2d 49 (1988), *sentence vacated on other grounds*, 494 U.S. 1021, 108 L. Ed. 2d 601 (1990), *on remand*, 330 N.C. 66, 408 S.E.2d 732 (1991). *State v. Lowery*, 318 N.C. 54, 347 S.E.2d 729 (1986), seems to be the sole exception, but there the jury unanimously found two mitigating circumstances—that Lowery's capacity to conform his conduct to the requirements of the law was impaired and the catchall mitigating circumstance.

STATE v. HUNT

[330 N.C. 501 (1992)]

2.

[3]  We find no merit in defendant's contention that A.R. Barnes' recanted statements that he killed Ransom might have been found by a reasonable juror to have mitigating value. During the guilt phase, defendant presented evidence through Lumberton Police Detective Mike Stogner and State Bureau of Investigation Agent Lee Sampson that tended to show that on 27 September 1984, A.R. Barnes, brother of Elwell Barnes, gave two statements to the police, in which he stated that he had killed Ransom. In the first statement, he said he shot Ransom during an argument, and in the second statement, he said he shot Ransom in self-defense. The following day, he recanted both statements, explaining that he was trying to protect his brother, codefendant Elwell Barnes. The recantation evidence was brought out at trial by counsel for A.R. Barnes as well as by the prosecutor. Defendant merely introduced the statements of A.R. Barnes. No other evidence presented by defendant during the guilt phase corroborated A.R. Barnes' statements. All the evidence tended to show that A.R. Barnes falsely confessed to killing Ransom to protect his brother, Elwell. The statements were clearly false and of no evidentiary value. It is also clear that the jury disbelieved this evidence because it unanimously rejected the evidence by its guilt phase verdict. No further evidence having been presented at the sentencing proceeding concerning these statements, no reasonable juror could have found A.R. Barnes' recanted statements to be of mitigating value.

3.

[4]  Defendant contends that jurors might have found mitigating value in the fact that there was "no evidence that either Jackie Ransom or Larry Jones [was] psychologically tormented or physically tortured before they died." Essentially, defendant contends that the absence of such an aggravating circumstance could, in fact, be mitigating. We reject any such notion. The mere absence of evidence to establish an aggravating circumstance does not present a mitigating one. See State v. Brown, 306 N.C. 151, 179, 293 S.E.2d 569, 587, cert. denied, 459 U.S. 1080, 74 L. Ed. 2d 642 (1982). Moreover, here, as to the Ransom killing, there are no details that would legitimately warrant a reasonable juror in finding the absence of psychological torment. As to the Jones killing, the evidence contradicts such a contention. After Jones was shot several times

in the car, defendant had Ratley assist him in pulling the victim out of the car. As Jones lay on the ground, Ratley heard him plead, "Mule, Mule, Mule," referring to defendant. Elwell Barnes yelled to defendant that Jones was not dead yet, and Elwell Barnes pointed a shotgun at Jones' head. Defendant then knocked the shotgun away and told Elwell Barnes not to shoot Jones with the shotgun. Defendant got the pistol and emptied it into Jones. It would be pure speculation to argue that Jones did or did not overhear defendant and Elwell Barnes arguing over how to finish him off as he lay there begging; but it was firmly established that he lived for some time between being shot in the car and being shot on the ground. What physical or psychological pain or torment he suffered during that time no one knows. Based on the evidence presented, we conclude that the mitigating circumstance suggested by defendant is, at best, speculative and would have had no impact on the jury's recommendation.

4.

[5]  Defendant next contends that one or more jurors might have found as a circumstance in mitigation that he was a heavy drinker and had consumed a large amount of alcohol during the weekend he murdered Ransom and Jones. He suggests that a reasonable juror might have found that his alcohol consumption somehow impaired his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. We find nothing in the record before us to legitimately support this suggested mitigating circumstance. While there was some evidence tending to show that defendant drank some whiskey on the day of the Jones murder, it does not suggest that he was a "heavy drinker." Nor does the evidence support a finding of impaired capacity. Rather, the evidence shows only that on the day Jones was killed, a fifth of whiskey was being passed around in the car in which defendant, Cummings, and Ashley Hammonds were riding. When the group got back to Fayetteville, they were joined by Ratley and Elwell Barnes at a mobile home belonging to defendant and Cummings. There, Cummings accused Hammonds of having drunk more than half of the bottle and declared, "The rest of it is mine." This would tend to indicate that together Cummings, Barnes, and defendant consumed less than one-half of the fifth. There is a dearth of evidence as to how much of this whiskey defendant actually consumed, and thus nothing in the record would permit us or a jury to speculate as to the effect that defendant's

alcohol consumption had on his abilities. As to the Ransom murder, there is no evidence whatsoever that defendant drank any alcoholic beverages beforehand. We find this contention meritless.

5.

[6] Defendant suggests that "it was doubtless apparent" to the jury that defendant was an uneducated man with a background of poverty and disadvantage. Defendant acknowledges that no evidence to this effect was presented by any party. The record does not indicate that the jury ever heard defendant utter a word during the entire trial. It would be pure speculation as to what a juror or jurors might have perceived about defendant, as there is nothing at all in the record to support such a conclusion.

6.

[7] Defendant's final suggestion is that, although defendant presented no evidence, one or more jurors could have concluded solely from observing defendant's demeanor that defendant was regretful and remorseful for the murders of Ransom and Jones. Defendant does not direct our attention to any item of evidence or refer to anything in the record from which a juror could assess any attitudes of regret or remorse by defendant. Defendant did not take the stand, did not present any evidence at the penalty phase, and did not argue his demeanor to the jury. We find in the record only two possible, oblique references to defendant's demeanor, and neither is favorable to defendant.

The prosecutor, in his penalty phase argument, said:

Did you see any remorse in this case? Have you seen any contrition? Have you seen any tears for Jackie? Have you seen any regrets? Quite the contrary, from [defendant], you have seen just the opposite. Bernice [Cummings] out in the hall way, "Are you sorry you did it . . . to my cousin, Larry [Jones]? No, that God damn son-of-a-bitch ratting on me," or words to that effect. Contrition? Regrets? No sorrow. No pain. Just going through the motions. No humanity demonstrated in this case.

The prosecutor's reference to a conversation between defendant and Cummings was based on Cummings' direct testimony at the guilt phase. From Cummings' testimony, it appears that at some time after the murders, she accompanied defendant to the court-

house for defendant's trial on some unrelated drug charges. While defendant was waiting to see if he could get his case continued, he and Cummings had a conversation outside the courthouse. Cummings asked defendant if he was sorry for killing Jones, to which he responded, "Hell no, the sorry ratting son-of-a-bitch supposed [sic] to be dead." Defendant continued by saying he buried "the sorry son-of-a-bitch" where he would never be found. Because all the evidence and references of record show defendant was not regretful or remorseful, no reasonable juror would have found that he was.

[8]   We said in *McKoy*, "it would be a rare case in which a *McKoy* error could be deemed harmless." *State v. McKoy*, 327 N.C. at 44, 394 S.E.2d at 433. However, we suggested in a footnote in *McKoy* two categories of cases that could be candidates for a successful argument that a *McKoy* error was harmless: a case in which there was little or no mitigating evidence proffered, or a case in which the jury found the existence of all proposed mitigating circumstances but nonetheless imposed the death penalty. In the more than thirty *McKoy* cases that this Court has considered as of its December 1991 session, in only one has the Court determined that the error was harmless beyond a reasonable doubt for the reasons we anticipated in *McKoy*. *State v. Roper*, 328 N.C. 337, 402 S.E.2d 600 (in which the jury found all fifteen mitigating circumstances submitted). In only one other case have we found the *McKoy* error to be harmless, and that case involved yet another category. *State v. Laws*, 328 N.C. 550, 402 S.E.2d 573 (in which the individual polling of jurors disclosed unanimity of rejection of submitted mitigating circumstances).

We conclude that the case at bar is one of those rare cases we anticipated in *McKoy* wherein the error is harmless because there is little or no mitigating evidence offered or arising from the evidence presented. Here, defendant offered no evidence during the sentencing phase of his trial. He did not cross-examine the State's witness who presented the evidence of defendant's prior felony convictions (evidence supporting one of the two aggravating circumstances found in each case by the jury), and he did not cross-examine any of codefendant Barnes' witnesses during their presentation of Barnes' mitigating evidence.

We find in the evidence suggested by defendant nothing that a juror could reasonably find to be mitigating, and further our

thorough review of all the evidence presented discloses no such evidence. Even giving the most favorable reading to the relatively inconsequential evidence that defendant contends supports a finding of the catchall mitigating circumstance, we conclude that the *McKoy* error here is harmless beyond a reasonable doubt.

We have previously reviewed defendant's other assignments of error on his direct appeal and concluded that the trial was without error. *State v. Hunt*, 323 N.C. 407, 373 S.E.2d 400.

Accordingly, the sentences of death are affirmed, and the mandate of our prior opinion is reinstated. The case is remanded to the Superior Court, Robeson County, for further proceedings.

Death sentences affirmed; mandate reinstated; case remanded.