Henry Lee HUNT, Petitioner–
Appellant,

v.

R.C. LEE, Warden, Central Prison,
Raleigh, North Carolina,
Respondent–Appellee.

No. 01–28.

United States Court of Appeals,
Fourth Circuit.

Argued April 3, 2002.

Decided May 23, 2002.

**ARGUED:** D. Stuart Meiklejohn, New York, New York, for Petitioner–Appellant. Gerald Patrick Murphy, Special Deputy Attorney General, North Carolina Department Of Justice, Raleigh, North Carolina, for Respondent–Appellee. **ON BRIEF:** Steven L. Holley, Richard C. Pepperman, II, Brent J. McIntosh, New York, New York; James R. Parish, Fayetteville, North Carolina, for Petitioner–Appellant. Roy Cooper, Attorney General of North Carolina, North Carolina Department of Justice, Raleigh, North Carolina, for Respondent–Appellee.

Before NIEMEYER, KING, and GREGORY, Circuit Judges.

Affirmed by published opinion. Judge NIEMEYER wrote the opinion, in which Judge KING and Judge GREGORY joined.

## OPINION

NIEMEYER, Circuit Judge.

In 1985, Henry Lee Hunt was convicted in the Superior Court of Robeson County, North Carolina, of two counts of capital murder for the contract killing of Jackie Ransom and the witness-elimination killing of Larry Jones.

On appeal from the district court's denial of his petition for a writ of habeas corpus, brought under 28 U.S.C. § 2254, Hunt contends (1) that he received ineffective assistance of counsel during the sentencing phase of his state-court trial because his counsel failed to present any mitigating evidence and because his counsel's closing argument was inadequate, essentially requesting jury nullification, and (2) that the state failed to turn over police notes of an interview with Jones, the victim of the second murder, in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which requires the state's disclosure of exculpatory information. Because we conclude that the state court's post-conviction decision rejecting these claims was neither contrary to clearly established federal law, as determined by the United States Supreme Court, nor involved an unreasonable application of that law, we affirm the district court's judgment based on the same conclusion.

I

At Hunt's state-court trial, the state prosecutor presented evidence that Dottie

Ransom and her husband, Rogers Lock-lear, hired Elwell Barnes for $2,000 to kill Jackie Ransom, Dottie Ransom's other husband. (Dottie Ransom married Jackie Ransom without divorcing Locklear.) Dottie Ransom's motive was to obtain the $25,000 proceeds from a life insurance policy that she purchased on Jackie Ransom's life so that she could buy a trailer home. Barnes recruited Henry Lee Hunt to help in the murder, and on September 9, 1984, Hunt advised Locklear that he had killed Jackie Ransom "last night" and demanded the $2,000 payment. Hunt threatened to kill Locklear and Dottie Ransom if Hunt was not paid within 30 days.

The next day, Hunt heard that Larry Jones, an acquaintance and a first cousin of Hunt's girlfriend, Bernice Cummings, was "running his mouth" by talking to the police about who had killed Jackie Ransom. Hunt told Cummings that "he was going to put a stop to [Jones'] damn mouth" and, on a separate occasion, that he was going to "kill that water-headed, ratting son-of-a-bitch Larry Jones."

During the evening of September 14, 1984, Hunt, Barnes and Jerome Ratley picked up the unsuspecting Jones and drove him to a deserted spot where Hunt shot Jones several times, point blank, telling him, "You don't eat no more cheese for no damn body else. I'll meet you in heaven or hell, one." When the three men dragged Jones out of the truck, he was still alive, so Hunt shot Jones again in the head.

After the bodies of Jackie Ransom and Jones were later discovered, one in Lumberton, North Carolina, and the other in Fairmont, North Carolina, 10 miles away, Hunt was indicted for two counts of capital murder and two counts of conspiracy to commit murder in connection with the murders of Jackie Ransom and Jones. The state court appointed two attorneys to represent Hunt, and he was tried jointly with Barnes. Following trial, the jury convicted Hunt on both counts of capital murder.

At sentencing, Hunt's counsel elected not to put on any mitigating evidence, concluding that the risk of revealing more about Hunt's criminal background outweighed the benefit that could be obtained from the evidence. For his argument to the jury, counsel asked the jury, as an act of mercy and conscience, to spare Hunt's life. While briefly alluding to the fact that Hunt had a family and was not perfect and recognizing that aggravating factors existed, counsel rested his argument principally on the barbarism of the death penalty and the moral progress that would be made by sparing Hunt's life. The jury, answering special interrogatories, sentenced Hunt to death on each count of capital murder.

On direct appeal, the Supreme Court of North Carolina affirmed both Hunt's convictions and his sentences. *North Carolina v. Hunt*, 323 N.C. 407, 373 S.E.2d 400 (N.C.1988). The United States Supreme Court, however, vacated the North Carolina Supreme Court's judgment and remanded the case for a harmless-error review of an instruction given during the sentencing phase, in light of the Supreme Court's intervening decision in *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). *Hunt v. North Carolina*, 494 U.S. 1022, 110 S.Ct. 1464, 108 L.Ed.2d 602 (1990). On remand, the North Carolina Supreme Court found that any *McKoy* error was harmless and reinstated its previous judgments. *North Carolina v. Hunt*, 330 N.C. 501, 411 S.E.2d 806 (N.C.1992). The United States Supreme Court then denied Hunt's petition for a writ of certiorari. *Hunt v. North Carolina*, 505 U.S. 1226, 112 S.Ct. 3045, 120 L.Ed.2d 913 (1992).

With new counsel, Hunt filed a post-conviction Motion for Appropriate Relief ("MAR") in North Carolina state court, requesting relief based on numerous violations of the United States and North Carolina constitutions. Following extensive hearings lasting five weeks, at which Hunt's original counsel testified about their trial strategy, the state court granted the state partial summary judgment. After a hearing on the remaining claims, the state court made findings of fact and conclusions of law, rejecting the remainder of Hunt's claims. The North Carolina Supreme Court denied Hunt's petition for a writ of certiorari from both the summary judgment and the state court's decision on his remaining claims. *North Carolina v. Hunt,* 336 N.C. 783, 447 S.E.2d 436 (N.C. 1994); *North Carolina v. Hunt,* 345 N.C. 758, 485 S.E.2d 304 (N.C.1997). The United States Supreme Court also denied Hunt's petition for a writ of certiorari. *Hunt v. North Carolina,* 522 U.S. 861, 118 S.Ct. 163, 139 L.Ed.2d 107 (1997).

On April 10, 1998, Hunt filed a petition for writ of habeas corpus in the district court under 28 U.S.C. § 2254, alleging that he received ineffective assistance of counsel during both the guilt and sentencing phases of his trial on several grounds. He also claimed that the state failed to disclose exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Finally, he alleged six other miscellaneous violations of the United States Constitution. The district court granted the state's motion for summary judgment, rejecting all of Hunt's claims. This appeal followed. The district court granted a certificate of appealability as to Hunt's ineffective-assistance-of-counsel claim at the sentencing phase of trial and denied his claim based on the state's failure to comply with *Brady v. Maryland.* We granted a certificate of appealability on that claim.

## II

In making his principal argument, Hunt contends that he received ineffective assistance of counsel during the sentencing phase of his trial because his counsel "failed to present any mitigating evidence whatsoever and conceded the existence of aggravating circumstances, relying instead on a jury nullification argument based on general moral opposition to the death penalty." He argues that his counsel's performance denied him the right to have the effective assistance of counsel for his defense as guaranteed by the Sixth and Fourteenth Amendments.

Ruling on Hunt's post-conviction MAR in a detailed 110–page opinion, the Superior Court of Robeson County considered every argument that Hunt now presents and evaluated it against the standard for ineffective-assistance-of-counsel claims, as set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Following a detailed analysis of the claims, the court then concluded:

> [Hunt's counsel's] decision to not present evidence at penalty phase was reasonable. Hunt had rejected utilizing a psychiatrist. Neither Hunt nor his family members wanted to testify. Hunt's criminal record was significant and the details of the offenses had not come out. [Hunt's counsel] were confronted with putting on reluctant family members many of whom were linked to attempts to destroy evidence and intimidate witnesses. These problems were caused by Hunt. Moreover, Hunt's record contained prior bad acts which were not the subjects of convictions and the attorneys knew from discovery the State was going to try and link Hunt to other murders. They were concerned about opening the door. [Hunt's counsel's]

performance at sentencing phase was not deficient. Any arguable errors did not prejudice Hunt.

Continuing its summary with respect to Hunt's challenge of his counsel's closing argument to the jury, the state court concluded:

The Court has reviewed [counsel's] closing argument and finds it contains many conventional arguments often heard in death penalty cases. [Counsel] connected himself with Hunt telling the jury he was "proud to be in a position ... that I can speak to save somebody." He acknowledged the sorrow of the victims' loved ones but point[ed] out Hunt also had a family and the jury could exercise its choice to let him live. [Counsel] argued life imprisonment was substantial punishment and that any aggravating circumstances the jury may find simply were not substantial enough to warrant the death penalty.

\* \* \* \* \* \*

While [counsel's] argument clearly questioned whether capital punishment had any place in a civilized society, his argument was far from an all out attack on the death penalty. In the context of this case, [counsel's] argument was professionally reasonable and incorporated conventional subject matter often used in capital cases.... Hunt has failed to prove [counsel's] argument was either deficient or prejudicial.

■ On Hunt's federal habeas petition, the district court reviewed the state court's decision against the standard prescribed in 28 U.S.C. § 2254(d). With respect to these claims, the district court concluded that "Hunt has not established that the state court's adjudication of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, or that the state court's findings are unreasonable in light of the evidence pre-

sented." Our review is *de novo*, applying the same standard applied by the district court. See Savino v. Murray, 82 F.3d 593, 598 (4th Cir.1996).

■ The law that Hunt seeks to apply respecting ineffective assistance of counsel was, at the time of his convictions, clearly established. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (setting forth the standard for establishing ineffective-assistance-of-counsel claims). Under *Strickland*, Hunt must demonstrate (1) that his counsel's performance was "deficient" in that it "fell below an objective standard of reasonableness" and "outside the wide range of professionally competent assistance," *id.* at 687–90, 104 S.Ct. 2052, and (2) that the deficient performance "prejudiced the defense" in that, "but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 687, 694., 104 S.Ct. 2052

■ A court's evaluation of counsel's performance under this standard must be "highly deferential" so as not to "second-guess" the performance. *Id.* at 689, 104 S.Ct. 2052. To eliminate the distortions of hindsight, a court must evaluate counsel's performance "from counsel's perspective at the time." *Id.* Because of the difficulty of making this inquiry in the context of the wide range of reasonable strategic approaches, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks and citation omitted).

■ The question, therefore, is whether Hunt can demonstrate that the state

court's rejection of his ineffective-assistance-of counsel claim was contrary to those clearly established principles or involved an objectively unreasonable application of them. *See* 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 409, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). This standard is more stringent than reviewing for error or incorrectness. On habeas review, it is not sufficient in meeting the § 2254(d)(1) standard merely to find the state court's decision erroneous or incorrect; we must *also* find it unreasonable. *Williams*, 529 U.S. at 411, 120 S.Ct. 1495.

In this case, Hunt does not challenge the state court's factual findings as unreasonable in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2). Rather, he contends it was error to apply *Strickland* to conclude that he received effective assistance of counsel when his counsel "failed to present any mitigating evidence whatsoever and conceded the existence of aggravating circumstances, relying instead on a jury nullification argument based on general moral opposition to the death penalty."

Hunt maintains that there were over 20 mitigating circumstances that could have been presented and that some witnesses were ready and willing to testify at Hunt's sentencing hearing. These mitigating circumstances fall into five general categories relating to (1) Hunt's impoverished and violent childhood, (2) his role as a supportive and giving father, (3) his service as a dependable and hardworking employee, (4) his good behavior in prison, and (5) his existing emotional and mental disturbances. At the state MAR hearing, Hunt's counsel testified that there were reasonable, strategic reasons for not introducing this evidence. They explained generally that after they "reviewed" an extensive list of possible mitigating factors, they spoke to several of the potential mitigating witnesses, such as Hunt's sisters Aggie Nora and Betty, Hunt's father, Sam Hunt, and Hunt's employer, discussing Hunt's "family background" and his job performance. Counsel found that many potential witnesses were "scared" to talk about Hunt because of threats made to them. Although counsel did not interview every possible mitigating witness or track down every piece of potentially mitigating evidence, they became familiar with the nature, scope, and availability of mitigating evidence. Upon evaluating the potential mitigating evidence, counsel made a strategic decision not to put on any mitigating evidence because the damaging evidence that could have been elicited through cross-examination and from rebuttal witnesses would have outweighed any benefit to be claimed from the mitigating evidence. In addition, Hunt himself refused to subject himself to any psychiatric tests or interviews.

Specifically, with respect to Hunt's impoverished and violent childhood, Hunt's counsel could have shown that his father was an illiterate and violent alcoholic who was extremely abusive to Hunt and his 14 siblings, as well as to Hunt's mother. There was evidence that his father would have the children fight each other for his "amusement." Hunt's mother had an affair with Hunt's father's best friend and deserted the family in 1964, leaving them with nothing. She too was physically abusive to the children. The family was poor, and Hunt dropped out of school in the sixth grade. This evidence could have been presented either through Hunt himself or through one of his siblings, such as Aggie Nora, who discussed Hunt's childhood with Hunt's counsel during their 10–15 interviews. If counsel had proceeded to put Hunt or his sister on the stand, however, either could have been cross-examined about Hunt's prior criminal acts and criminal record. That record was extensive and

included the unindicted murder of Wyles Jacobs, several armed robberies, Hunt's dynamiting of his mother's house, and a drug offense. Hunt's counsel were also concerned that Aggie Nora would testify about "other family members being involved in trying to suppress or intimidate witnesses." There were indications that Hunt was trying to "get people to dispose of evidence . . . or to threaten people to be quiet" while he was in prison. One of Hunt's brothers, Wilbert, had passed a gun to Bernice Cummings, Hunt's girlfriend, so that she could kill a potential witness to the Wyles Jacobs murder. Thus, counsel concluded that revelation of this violent and criminal background would have undone whatever benefit would have been gained from the evidence.

Hunt also argues that his counsel could have presented the testimony of Bernice Cummings about Hunt's role as a supportive and giving father. But putting Cummings on the witness stand also risked damaging revelations. For example, she had been kept in a protective custody program from the time of the murders until the time of trial because of her fear that Hunt would kill her and her fear of Hunt's family. Moreover, Cummings herself was involved in witness intimidation and obstruction of justice, as discussed above.

Hunt contends that his counsel should also have offered testimony at sentencing about Hunt's successful employment and his performance as a "willing, dependable, and responsible worker." But after speaking to Hunt's employer, Hunt's counsel concluded that such testimony would be decidedly double-edged. While the employer liked Hunt and felt that he was a good worker, he added that Hunt was "a man's man," meaning he was "scared of Mr. Hunt" and "no one would cross him." Hunt's counsel decided that if this evidence about good employment were intro-duced, it would also open the door to rebuttal testimony that Hunt's coworkers were afraid of him because of his various actions and to questions about whether the employer's view would be different in light of Hunt's criminal history.

Hunt also argues that counsel should have introduced testimony of prison guards who could have testified about Hunt's rehabilitation and good behavior in prison. But again, the evidence would have been double-edged. One of Hunt's prison guards testified at the post-conviction MAR hearing about an incident in which Hunt "hit [another prisoner] with a shank in the pit of his stomach . . . [and] his intestines was coming out." This testimony might also have provided an opening to the introduction of other violent conduct in Hunt's past, negating the positive aspects of the guards' testimony.

Finally, Hunt asserts that his counsel should have introduced evidence from a psychiatrist about the fact that he was "neurologically impaired" in a way that "affected his ability to appreciate the criminality of his conduct." But during the trial, Hunt refused to be interviewed or examined by a psychiatrist. He was, however, interviewed by a psychiatrist after the trial, who concluded that Hunt did have a neurological impairment. Additionally, Hunt's counsel testified at the post-conviction MAR hearing that because Hunt had consistently maintained during the guilt phase that he had not committed the crime, such psychiatric evidence was irrelevant; it would have been relevant only on the implied assumption that Hunt had committed the murders.

The state court considered these matters at length and in greater depth than is summarized here and concluded that counsel's investigation of Hunt's social history "was clearly reasonable and sufficiently complete to support his strategic decision

not to present social history evidence at the sentencing phase." And our review of the state MAR record confirms the district court's conclusion that not only were the factual determinations reasonable in light of the record, but also that the state court's determination was neither contrary to *Strickland* nor an unreasonable application of its principles. *See* 28 U.S.C. § 2254(d).

Hunt argues nonetheless that the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389, supports his contention that it is an unreasonable application of *Strickland* to conclude that counsel can provide effective assistance when they fail to put on any available mitigating evidence. But neither the Supreme Court nor this court has ever held that it is *per se* ineffective assistance of counsel not to introduce mitigating evidence at sentencing. Indeed, in *Burger v. Kemp*, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987), the Court held that because the potentially mitigating evidence about the defendant's troubled family background was "by no means uniformly helpful to [the defendant] because they suggest violent tendencies," it was not objectively unreasonable not to introduce that evidence. *Id.* at 793, 107 S.Ct. 3114. Where defense counsel had interviewed "all potential witnesses who had been called to his attention" and had a "reasonable basis for his strategic decision that an explanation of [the defendant's] history would not have minimized the risk of the death penalty," his actions were reasonable and not constitutionally deficient. *Id.* at 794–95, 107 S.Ct. 3114. And the decision in *Williams v. Taylor* does not suggest otherwise. There, the Court found it to be ineffective assistance of counsel only where counsel "failed to conduct an investigation that would have uncovered extensive records graphically describing [the defendant's] nightmarish childhood." 529 U.S. at 395, 120 S.Ct. 1495. Thus, it was the failure to *investigate*, not the failure to *present*, mitigating evidence that led to the conclusion that the defendant had been denied effective assistance of counsel.

In this case, counsel had conducted a sufficient investigation to make the tactical decision that it would be more harmful to Hunt to present mitigating evidence than it would be not to present it. Thus, this case is more analogous to *Burger* and to our decision in *Bunch v. Thompson*, 949 F.2d 1354 (4th Cir.1991). In *Bunch*, we held that counsel did not render ineffective assistance when he failed to introduce sentencing testimony of the defendant's psychiatrist because, even though some of the evidence would have been "beneficial," there were also "risks involved if the psychiatrist had taken the stand." 949 F.2d at 1364. Some "harmful evidence would have emerged on cross-examination [sic]" that could have "reenforce[d] all the negative aspects of [the defendant's] self-destructive behavior." *Id.*

■ In short, the state court did not make an unreasonable application of *Strickland* in concluding that Hunt's counsel engaged in a reasonable investigation into possible mitigating factors and then made a reasonable strategic choice in not offering evidence of those factors because to do so would have opened the door to more damaging cross-examination or rebuttal evidence. Indeed, the state court was not even in error—a less demanding standard than "reasonableness"—in concluding that this legitimate and often-used trial strategy, based on a full investigation, did not constitute ineffective assistance of counsel. *See Burger*, 483 U.S. at 795, 107 S.Ct. 3114; *Bunch*, 949 F.2d at 1365.

■ Hunt also contends that his counsel provided ineffective assistance in making a

closing argument to the jury that relied "on a jury nullification argument based on the supposed immorality of the death penalty." By presenting no mitigating evidence and acknowledging the existence of aggravating factors, Hunt claims, "the jury had no choice but to conclude that aggravating circumstances outweighed mitigating circumstances" and was essentially forced to choose to impose a sentence of death. The state court concluded that not only was this argument not deficient, it was "often heard in capital cases."

While North Carolina law does require the jury to weigh aggravating and mitigating circumstances, it nevertheless authorizes the jury, based on this weighing to decide ultimately "whether the defendant should be sentenced to death or to imprisonment in the State's prison for life." N.C. Gen.Stat. § 15A–2000(b)(3). Consistent with this statute, the state trial judge submitted to the jury the special verdict interrogatory: "Do you unanimously find, beyond a reasonable doubt, that the aggravating circumstance or circumstances found by you is or are sufficiently substantial to call for the imposition of the death penalty when considered with any mitigating circumstance or circumstances found by you." It was on the discretion given to the jury through § 15A–2000(3) and this interrogatory that counsel for Hunt focused during his closing argument.

Hunt's counsel pointed out to the jury that the prosecutor had "talk[ed] to you about death. I will talk to you about life." He then turned to the larger philosophical, moral and religious questions about life and death and requested the jury, in answering issue four on the verdict form, to find for life: "[The prosecutor], in all his grandeur, would suggest to you that Henry Lee Hunt should receive the death penalty and with equal grandeur, I will ask the question, 'Should he?' and I suggest to

you that the answer is a resounding no ... You know, I understand that with all of life's human failures, and recognize, that with all of life's human short comings that to impose such a penalty of death is cruel and unnecessary." Hunt's counsel then appealed for mercy for Hunt and his family: "Both Jackie Ransom and Larry Jones, I'm sure, left loved ones with tears and with sorrows.... You know, Henry Lee Hunt has a family, and, you know, today, Henry Lee Hunt doesn't have a choice, but you do.... If you want to punish Henry Lee Hunt, I suggest to let him live. You cannot punish him when he's dead." Focusing particularly on the fourth interrogatory submitted to the jury, Hunt's attorney stated: "I want you to think about whether any aggravating circumstances are sufficiently substantial for you to take this man's life in either one of those cases ... Now, his honor will instruct you that even if you find aggravating circumstances and no mitigating circumstances, you will still have a chance to answer Issue Number Four no."

It is true that Hunt's counsel spent some time talking about the history of the death penalty and its barbaric nature, indicating to the jury that its choice should be historically progressive in that the jury should not elect death as a method of punishing Hunt. Then returning to the present situation, counsel argued: "None of us are perfect. No, not even the least of us, but you do have the power to choose. You see, that is what separates you from Jackie Ransom, from Larry Jones, and Henry Lee Hunt. You can choose the love or hate.... You can say for these reasons I choose not to take Henry Lee Hunt's life."

The strategy that Hunt's counsel was pursuing was to find the one juror whose conscience would not permit a finding of death, even though the jury had been qualified for the death penalty, and to rely on

the inadequacy of the aggravating circumstances to support a death sentence. Indeed, Hunt's counsel specifically appealed to jury vulnerability with this approach, arguing, "From the jury selection process, I have learned that some of you have just recently formed your attitudes and beliefs or opinions about capital punishment. You know, this is important to me, because it reaffirms what I've always believed, that attitudes and opinions and beliefs are not contained in a vacuum during the life of an individual. Attitudes, opinions and beliefs do change over the experience, over life's experience in this earthly existence."

The state court at the MAR hearing found the argument conventional and well within the scope of reasonable arguments to be made in capital cases and concluded counsel's performance was not deficient.

But Hunt argues that he received ineffective assistance of counsel because his counsel failed to argue evidence to the jury that was specific to Hunt and his crimes, arguing instead against the death penalty based on moral or religious standards. In addition, he contends that his counsel should not have acknowledged "certainly, there are aggravating circumstances in these cases." As a result of this combination of errors, Hunt asserts that his counsel was improperly seeking jury nullification.

First, in view of the record, and Hunt's counsel's decision not to introduce evidence of mitigating factors, Hunt's counsel concluded that he could not focus on the specific weighing of aggravating and mitigating circumstances. He had elected, instead, to focus on interrogatory four that allowed the jury, *after* weighing the factors, to find that mercy outweighed the aggravating circumstances and the aggravating circumstances were not sufficient to justify the death penalty. *See, e.g., State v. Conner,* 345 N.C. 319, 480 S.E.2d 626,

632 (N.C.1997). While he acknowledged the existence of aggravating circumstances, counsel also indicated that Hunt had a family, that Hunt was not perfect, and that the more merciful course would be to spare Hunt's life. We cannot conclude that the state court's decision to find this argument reasonable in light of North Carolina law unreasonably applied the *Strickland* standard. The state court found Hunt's argument typical of death penalty arguments, and, indeed, it may have been the strongest argument that Hunt's counsel could have made in light of the record.

Hunt nevertheless argues that it cannot be reasonable to approve an argument that improperly seeks jury nullification. Again, Hunt fails to recognize the scope of authority given to a jury in a North Carolina capital case. His counsel did not ask the jury to ignore the law; rather, he asked the jury to focus on the fourth interrogatory on the verdict form and determine whether the aggravating circumstances were sufficiently substantial that "the defendant should be sentenced to death." N.C. Gen.Stat. § 15A–2000(b)(3). In answering this interrogatory, the North Carolina Supreme Court has stated that it is not inappropriate to consider sympathy or mercy. *See Conner,* 480 S.E.2d at 632 (holding that while the court may not instruct that sympathy is a mitigating factor, the "catchall" mitigating factor phrase in N.C. Gen.Stat. § 15A 2000(f)(9) permits consideration of sympathy).

Finally, even though the closing argument carried a heavy religious and moral overlay, it was not error under North Carolina law to make such an argument in a capital case. *See North Carolina v. Barrett,* 343 N.C. 164, 469 S.E.2d 888, 899 (N.C.1996) (holding that prosecutor's closing argument that contained Biblical references was not reversible error and North

Carolina has upheld such arguments as long as argument is not that State law is divinely inspired or that law officers are divinely ordained); *McDougall v. Dixon,* 921 F.2d 518, 539 (4th Cir.1990) (applying N.C. law). Indeed, in *McDougall,* we concluded that in a death penalty case, it was a "conventional argument" to discuss with the jury "the irrevocability of the death penalty verdict, the mitigating factors in favor of the defendant, Biblical passages in support of mercy, other arguments indicating that the death penalty was not a proper solution for McDougall." *Id.* at 535. In that case, one of the counsel argued that the death penalty was "a cold blooded, premeditated killing by the state," quoting Clarence Darrow, Martin Luther King, Jr., and the Bible, "including a complete recitation of the Beatitudes." *Id.* at 536.

While some attorneys might consider the argument made by Hunt's counsel to have been a "desperate appeal," it nevertheless was an "appeal ... made with full knowledge of the facts and the law, and the options available to him." *McDougall,* 921 F.2d at 537. In these circumstances, we cannot conclude that the state court's finding that Hunt received effective assistance of counsel was an unreasonable application of *Strickland.*

### III

■ Hunt also contends that the State violated his rights under *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), when it failed to turn over police notes documenting Larry Jones' conversations with police officers. Hunt argues that the notes were both exculpatory and material to his defense.

These police notes would have revealed that Jones had been talking to the police but had not identified Hunt as Ransom's killer. Hunt argues that the notes should have been turned over as exculpatory because they could have been used (1) to bolster the testimony of defense witnesses about Hunt's lack of motive to kill Jones, (2) to show that Hunt did not commit the crime, and (3) to impeach the testimony of Bernice Cummings who testified that, according to Hunt, Larry Jones had been "running his mouth" about the Ransom murder and that Hunt "would put a stop to his damn mouth." Hunt argues that this evidence would have demonstrated, contrary to Bernice Cummings' testimony, that Jones was not in fact running his mouth.

Hunt's argument, however, overlooks the state's theory that Hunt killed Jones because Hunt *believed* that Jones was talking to the police and telling them that Hunt killed Ransom. It is irrelevant whether Jones had actually told the police that Hunt was Ransom's killer. The critical issue is whether Hunt believed that Jones was telling the police that Hunt was the killer. And on that point, there was ample evidence to support the motive, given Hunt's statement to Cummings that he was going to "kill that water-headed, ratting son-of-a-bitch Larry Jones." Moreover, the notes confirmed that Jones had been talking ("running his damn mouth") to the police, which would only serve to bolster evidence of Hunt's motive given that there was no way for Hunt to have known exactly what Jones was telling the police.

Hunt's *Brady* claim is without merit and it follows that the state court's conclusion that the failure to turn over the notes did not violate *Brady* was not an unreasonable application of federal law. *See Williams,* 529 U.S. at 413, 120 S.Ct. 1495.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*